1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAY EDELSON (Admitted *Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE, LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

*Attorneys for Plaintiffs and the putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BENSON WORLEY and JOHNNY BOYD, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> AVANQUEST NORTH AMERICA INC., a California corporation, <br><br> *Defendant.* | Case No. 3:12-cv-04391-SI <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** <br><br> 1. **Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;** <br> 2. **Fraudulent Inducement;** <br> 3. **Breach of Contract; and** <br> 4. **Breach of the Implied Covenant of Good Faith and Fair Dealing.** <br><br> Judge: Honorable Susan Illston <br> Action Filed: August 21, 2012 |

Plaintiffs Benson Worley ("Worley") and Johnny Boyd ("Boyd") (collectively, "Plaintiffs") bring this First Amended Class Action Complaint ("Complaint") against Defendant Avanquest North America Inc. ("Avanquest" or "Defendant") for its practice of defrauding consumers through the deceptive design and sale of its software products. Plaintiffs, for their Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.      Avanquest is a multi-national developer of software products that it claims will increase the speed, performance, and stability of a consumer's personal computer ("PC"), protect against privacy risks, remove harmful errors, and improve Internet speeds. Unfortunately for consumers, however, Avanquest's methods of inducing consumers to purchase and continue to use its software, as well as the products' programmatic design, are highly deceptive.

2.      Through a common deceptive scheme, Avanquest uniformly defrauds consumers into purchasing and continuing to use the two products at issue in this lawsuit—Fix-It Utilities Professional ("Fix-It Utilities") and SystemSuite PC Tune-Up & Repair ("System Suite") (collectively, the "Scareware").

3.      The Scareware is available for purchase online through Avanquest's websites, third-party resellers, and in packaged form at brick-and-mortar stores such as Best Buy and Office Depot. Through the marketing materials contained on its websites, as well as the software's packaging itself, Avanquest represents that the Scareware will detect and repair a wide range of PC errors, privacy threats, viruses, and other computer problems. Avanquest also promises that the Scareware will increase system startup speeds, optimize a user's PC performance, and remove security risks.

4.      In reality, Avanquest's descriptions of the Scareware's utility serve as the initial phase of a fraudulent scheme to induce consumers into purchasing its products, and then to convince them into paying ongoing subscription fees to continue using the software.

5.      Although its software is technologically complex, the paradigm used by Avanquest

to defraud consumers is simple. First, Avanquest describes its Scareware as software that will restore a PC's functionality by removing harmful errors, privacy threats, and increasing Internet speeds. Induced by these representations, the consumer then purchases the Scareware. After installing and running the Scareware, the consumer is encouraged to conduct a "diagnostic scan" to assess the condition of his or her PC.

6.     The Scareware then invariably reports, in ominous fashion, that harmful problems are lowering the PC's condition. Thereafter, the user is offered the ability to "fix" the PC by removing the errors reported by the Scareware. However, as explained more fully herein, the Scareware's diagnostics procedures do not perform any credible evaluation of consumers' PCs. Instead, Avanquest intentionally designed the Scareware to invariably report that a user's PC needs repair and is afflicted with harmful errors, privacy risks, and other problems—regardless of the computer's actual condition. The average consumer logically assumes that errors detected through this "diagnostic scan" correspond to the harmful problems identified by Avanquest's marketing materials.

7.     The process described above is repeated each time a user runs the Scareware. Also of significance is that the Scareware is offered on a yearly subscription basis. As such, the average consumer (unaware of its deceptive nature) is convinced that the Scareware is detecting, reporting, and repairing actual errors harming their PC's performance. Thus, because the Scareware was designed to invariably "detect" harmful errors, the consumer is fraudulently induced into continuing to renew his or her subscription (or not to seek a refund).

8.     Avanquest holds itself out as a reputable leader in the "utility software" industry— i.e., software that enhances and or repairs a PC's functionality. Because average consumers lack the requisite technical expertise to understand the underlying operations of Avanquest's software, they trust the company to convey truthful information about its products, and for its products to honestly and accurately identify and remove harmful errors from their PCs. Avanquest betrayed that trust, and as a result thousands of consumers have been, and continue to be, tricked into paying for its

1   unlawful Scareware.

2                                    **PARTIES**

3       9.      Plaintiff Benson Worley is a natural person and citizen of the State of Wisconsin.

4       10.     Plaintiff Johnny Boyd is a natural person and citizen of the State of Georgia.

5       11.     Defendant Avanquest North America Inc. is a corporation incorporated in and

6   existing under the laws of the State of California, with its headquarters and principal place of

7   business located at 7031 Koll Center Parkway, Suite 150, Pleasanton, California 94566. Avanquest

8   conducts business throughout the State of California and the United States.

9                            **JURISDICTION AND VENUE**

10      12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

11  because (a) at least one Class member is a citizen of a different state than Defendant, (b) the amount

12  in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions

13  under that subsection apply to this action.

14      13.     This Court has personal jurisdiction over Avanquest because it conducts business in

15  California and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or

16  emanated from California.

17      14.     More specifically, Avanquest's relevant operations, including its headquarters and

18  primary sales and marketing operations are located in California. Vital employees, such as

19  Avanquest's Director of Online Marketing, Vice President of Strategic Sales and Marketing,

20  Director of Business Development, and Vice President of eCommerce and Direct Marketing are all

21  located in California. Thus, Avanquest's decisions regarding the programmatic design of the

22  software, as well as the representations made about the Scareware's utility, emanated from

23  California.

24      15.     Venue is proper in this District because Avanquest maintains its headquarters in this

25  District and because the improper conduct alleged in this Complaint occurred in, was directed to,

26  and/or emanated from this District.

27

28

---

FIRST AMENDED COMPLAINT               4               CASE NO. 3:12-cv-04391-SI

**INTRADISTRICT ASSIGNMENT**

16.     Pursuant to Civil Local Rule 3-2(d), this case has been assigned to the San Francisco Division.

**FACTUAL BACKGROUND**

**I.      A Brief Overview of Avanquest.**

17.     Founded in 1984 as French company BVRP Software, Avanquest[1] has today become a global leader in the PC utility software industry. Avanquest boasts that it is one of the "ten leading consumer software developers" in the world,[2] and asserts that its mission is to design software to "provide a more secure and enjoyable experience to people looking for easy and affordable software solutions in everyday life."[3]

18.     According to Avanquest, Fix-It Utilities and System Suite are its "#1 selling disk utility" and "Anti-virus/Anti-spyware" products. Avanquest claims that these software products offer a "complete package" that "make it easy to diagnose and fix your computer."

**II.     Fix-It Utilities Professional and SystemSuite PC Tune-Up & Repair are Substantially the Same Product.**

19.     While different in name, each Scareware product at issue here is substantially similar in functionality and design; so much so that Avanquest's marketing describes both Fix-it Utilities and System Suite as providing the same features and even created a single instruction manual for the two. *See* Figures 1-2 on the following page (showing screenshots of an Avanquest advertisement marketing the two products as having the same functionality, and the 'User Guide' included with purchase of the products).

---

[1]     In 1996, Defendant formed BVRP USA, which was later renamed Avanquest North America Inc.

[2]     Corporate Profile, http://www.avanquest.com/USA/corporate/company/history.html (last visited February 22, 2013).

[3]     Mission and Values, http://www.avanquest.com/USA/corporate/company/mission_and_values.html (last visited February 22, 2013).



(Figure 1.)



(Figure 2.)

20.     Additionally, and even to the untrained eye, a side-by-side comparison of the user interfaces from Fix-It Utilities and SystemSuite confirms that—aside from product name—the two appear virtually identical. *See* Figure 3 on following page (showing screenshots of Fix-It Utilities' and SystemSuite's initial graphical user interfaces).

1

2

3

4

5

6

7

8



9

(Figure 3.)

10

**III.     Avanquest Tricks Consumers into Purchasing its Scareware Through a Common Deceptive Scheme.**

11

21.     A consumer searching the World Wide Web for software to repair a damaged

12

computer, protect against privacy threats, or generally increase the speed or performance of a PC

13

will likely encounter advertisements for Avanquest's Scareware. Clicking on the advertisement re-

14

directs the individual to Avanquest's website, which contains representations about the Scareware's

15

utility.

16

22.     For example, a consumer viewing Avanquest's website is presented with the

17

following descriptions about the Scareware's functional capabilities:

18

    • "Fix, Speed Up & Maintain Your PC";

19

    • "One-Step PC Tool Wizards Make It Easy To Diagnose & Fix Your Computer";

20

    • "40+ PC Tune Up Tools Scan, Identify & Fix PC Problems"; and

21

    • "One-Click uncovers problems, helps you fix them & returns your PC to peak

22

        performance."

23

23.     These same representations are also found on the Scareware's physical packaging. In

24

particular, the above assertions are strategically located on both sides of the products' boxes, such

25

that consumers contemplating purchase can first read about their purported functionalities.

26

24.     Through these marketing materials, Avanquest also presents the consumer with

27

28

representations designed to frighten them into believing that their computer is at serious risk. For instance, Avanquest warns that:

- "The PC errors, crashes and freezes you're experiencing are generally caused by faulty settings, broken registry settings and hard drive problems, which unfortunately, come with regular PC use"; and

- "Every day you work, play or browse on your computer, useless junk builds up clutter on your hard drive. Unfortunately, clutter causes damaging disk and system problems and ultimately can create dangerous privacy problems."

25.     Regardless of where the consumer encounters these statements, Avanquest encourages the consumer to download or purchase the products to protect their computers.

**A.      Avanquest uniformly misrepresents the utility of its Scareware.**

26.     On its websites, as well as on the Scareware products' packaging (as indicated above), Avanquest displays specific affirmations about the Scareware's functionality. Avanquest generally asserts that its Scareware will improve the efficiency and performance of PCs, increase system stability, repair errors, stop PC crashes and freezes, and serve as a comprehensive tool to fix computer problems.

27.     More specifically, Avanquest represents through its website (www.avanquest.com) that the Fix-It Utilities and System Suite products are designed to:

- "Clean, fix and optimize the Windows Registry";
- "Stop PC Crashes and Freezes";
- "Repair System Errors";
- "Optimize Internet speed and memory";
- "[Provide] Total Virus and Spyware Protection"; and
- "[Provide] Complete PC Maintenance."

28.     On its website, Avanquest further asserts that "with Fix-It Utilities and System Suite's award-winning integrated technology[,] you'll get complete Virus Protection" that will

"[r]emove existing viruses, malware and spyware from your PC, plus prevent future infections without sacrificing speed and performance." Avanquest also states that "Fix-it Utilities runs hundreds of comprehensive diagnostic tests for you and will have your PC running like new all over again."

29.     Likewise, on its System Suite PC Tune-Up & Repair 12 retail product packaging, Avanquest asserts that the product will:

- "Fix Windows Problems";
- "Speed Up PC Start Time";
- "[Provide] Malware, Virus, and Spyware Protection";
- "[Provide] PC Diagnostics and Maintenance";
- "Eliminate PC Crashes and Freezes"; and
- "Clean and Repair Windows Registry."

30.     The same goes for Fix-It Utilities Professional 12's packaging, which claims that the product:

- "Keeps your PC running like new";
- "Intelligently identifies system slowdowns";
- "Fixes problems and speeds up Windows";
- "[Provides] Real time virus and spyware protection"; and
- "Stops PC Crashes and Freezes."

31.     But these representations do not accurately reflect the Scareware's true capabilities. The truth is that, irrespective of its "anti-virus" feature,[4] Fix-It Utilities and System Suite primarily perform only two main functions: they are registry cleaners and they remove superfluous "temporary" files from a user's hard drive. These operations do not come close to squaring with Avanquest's representations about the functionality of the Scareware. For instance, as discussed

---

[4]     Avanquest claims that its Scareware also provides "total virus protection," but Plaintiffs have their doubts about the anti-virus feature as well. In certain instances Plaintiffs' expert was able to demonstrate that although the Scareware *detected* a harmful virus, it did not actually remove it. Despite this, the Scareware reported the virus had been deleted.

more fully below, neither of these functions will remove damaging PC errors, appreciably improve a computer's boot time, nor prevent the common causes of system freezes.

32.     Because of the impression created by Avanquest's affirmations of fact about the Scareware's utility, consumers rightfully believe that Avanquest's software will detect the errors and problems identified above. To validate this belief, Avanquest designed the Scareware to appear as though it's performing actual analyses of consumers' PCs. This facade, however, is simply the next phase of Avanquest's scheme.

**B.     Avanquest falsely informs consumers that their computers need repair, without conducting any credible evaluation of their PCs' condition.**

33.     Upon purchasing, installing, and running the Scareware for the first time, a display screen is presented to the user indicating that the computer "is not optimized." *See* Figure 4 (showing screenshots of Fix-It Utilities' and System Suite's initial graphical user interfaces).



(Figure 4.)

34.     Clicking on the "Problems" section located on the Scareware's navigation bar triggers a display warning the user that "[x] amount of problems are affecting your PC's health and security" accompanied by an itemized list of problems that it claims are afflicting the computer, all of which (upon further inspection) refer only to the users' failure to have run the Scareware on their computer in the past, but not to any diagnoses of errors or problems actually existing on the computer. *See* Figure 5 (showing screenshots of Fix-It Utilities' and System Suite's error reporting interfaces *before* performing a diagnostic scan).



(Figure 5.)

35.     After warning the user that their computer is not optimized and is afflicted by serious problems, the Scareware advises the user to conduct a diagnostic scan by pressing "Analyze Now" or "One-Click Fix All."

36.     Upon completion of the diagnostic "scan," the Scareware renders an ominous graphical depiction of an alert sign showing that a number of serious "problems" exist on the computer and require fixing. *See* Figure 6 (showing screenshots of Fix-It Utilities' and System Suite's error reporting interfaces). In addition to this warning, the Scareware displays a visual representation of three cylinders, labeled "Optimization," "Security," and "Maintenance," with color spectrums ranging from red to green, along with corresponding percentages supposedly representing the results of an analysis of the computer's condition. *See id*.



(Figure 6.)

37.     While these visual and textual representations appear alarming to the user, the truth is that Avanquest designed the Scareware to report these conditions without *any* real evaluation of

the computer's condition. In this way, the user believes that the Scareware is actually detecting and reporting harmful errors, presumably associated with the errors that Avanquest represented the software would remedy.

**IV.    Plaintiffs' Expert Uncovers that Avanquest Designed its Scareware to Invariably Report Benign Errors as Harmful.**

38.     On the surface, it appears as if the software is actually detecting, reporting, and repairing errors that threaten the operations of a user's PC. In reality, however, Avanquest intentionally designed its Scareware to vastly overstate both the amount and severity of errors that the software purportedly fixes in an effort to convince consumers that it functions as advertised— i.e., that it actually detects and removes credible threats and PC problems.

39.     Through their attorneys, Plaintiffs have engaged a computer forensics expert to examine Avanquest's Scareware.[5] The results of this investigation confirm that the software always reports that a user's PC is in poor condition—regardless of the condition or type of computer the software is installed on. For instance, the Scareware's results shown in Figure 6 above were produced after conducting a diagnostic scan on a *brand new computer*. Ostensibly these representations scare the user into believing that the PC is damaged or at risk, and that continued use of the Scareware is necessary to "fix" these problems. The facts show otherwise. Plaintiffs' expert has determined that, by any stretch of the imagination, many of the errors detected *are not credible threats* to a PC's functionality.

40.     In relevant part, the expert's investigation uncovered that Avanquest programmed its Scareware to (i) always identify problems on a user's computer (even when none exist), (ii) artificially inflate the number of errors detected on a user's computer, (iii) characterize innocuous items as harmful threats, and (iv) arbitrarily report that the user's "Optimization," "Security," and "Maintenance" statuses are low without using any credible metrics to assess these issues.

41.     The expert's research also shows that the Scareware was deliberately designed to

---

[5]      All forensic testing described herein was performed on both the Fix-It Utilities and System Suite software. Because the functionality of the two products and the results of such tests were nearly identical, they are discussed collectively unless otherwise indicated.

mischaracterize the severity of errors to shock consumers into believing that their computers are damaged. For instance, the expert confirmed that the software detected a number of innocuous and benign files that *cannot* cause damage to a computer and reported that they were negatively impacting the computer's performance.

42.     Through the deceptive scheme described herein, Avanquest has profited, and continues to profit, by defrauding consumers into believing that their PCs are severely damaged and/or at risk, and that the purchase and continued use of its Scareware is necessary to "fix" these problems. But, because the software does not actually provide the benefits advertised, Avanquest does not deliver on its promises to its users.

**V.     Avanquest is Not Alone in its Fraudulent Conduct.**

43.     Unfortunately for consumers, Avanquest is not alone in its use of the sorts of fraudulent programmatic design and marketing practices at issue in this case. Rather, the utility software industry has been fraught with these tactics for over a decade. It is only recently, however, that software developers—like Avanquest and its competitors—have been called to account for their profiting off of consumers who are unable to identify the fraudulent technological design and methodologies underlying this type of supposedly performance-enhancing software.

44.     Indeed, numerous lawsuits have been filed against well-known competitors of Avanquest (e.g., Symantec Corp. and AVG Technologies)—including several by Plaintiffs' counsel here—alleging similar claims related to the fraudulent design and marketing of so-called utility software products. Several of those cases have resulted in classwide settlements and industry-changing modifications to the software products at issue—making their detection, reporting and repairing mechanisms far more transparent and more accurate when it comes to informing consumers of the threats posed by existing errors on their computers—and still others are being actively litigated. Rather than make the necessary changes to its software so that it *actually* detects, reports and repairs harmful errors and problems on users' PCs, Avanquest continues to profit through its fraudulent conduct

**VI.    Plaintiff Worley's Experience.**

45.    In early 2012, Plaintiff Benson Worley began to experience problems with his computer. Specifically, Worley's computer would occasionally "freeze up" and malfunction.

46.    Accordingly, Worley visited his local Wal-Mart retailer to search for software that would remedy his computer problems. At the store, Plaintiff discovered Avanquest's System Suite PC Tune-Up & Repair 12 software, and viewed Defendant's representations about the software's utility located on its box and packaging materials, such as those described above, including its assertion that the product will "Eliminate PC Crashes and Freezes."

47.    Relying upon the packaging's representations, Worley purchased Avanquest's System Suite PC Tune-Up & Repair 12 for $35.00. Plaintiff purchased System Suite under the belief—created by Avanquest's misrepresentations—that the software would accurately scan his computer for issues and prevent his computer from continuing to malfunction.

48.    Upon running System Suite PC Tune-Up & Repair 12 for the first time, the software reported that Worley's computer was afflicted with hundreds of errors, that the "Security," "Maintenance," and "Optimization" statuses of his computer were poor, and that it displayed graphical representations reflecting the same. Because Avanquest designed its software to *always* report these statuses, Worley was misled into believing that his computer was riddled with errors that were causing it to malfunction—although no actual assessment of the computer occurred.

49.    Through the software's design, Avanquest deceived Worley into thinking the Scareware was making meaningful repairs to his PC, thus he elected to continue using the program rather than ever seeking a refund. Worley was further deceived by the software's representations that it was removing harmful errors and threats from his computer.

50.    In reality, as described above, System Suite did not actually detect hundreds of errors as Avanquest claimed because the software arbitrarily reported problems as serious and cannot actually perform the beneficial tasks described in its marketing materials and advertisements. Nor did the software accurately identify and report the actual condition of Worley's computer. As such,

Worley was misled into believing that his computer was at-risk, and that he needed to continue to use System Suite in order to repair it.

51.     In fact, every time Worley ran System Suite, the software reported that harmful errors were adversely affecting his computer and that he needed to "fix" the errors using System Suite. Yet, despite the fact that he repeatedly ran System Suite's scan, and purportedly "fixed" the reported errors, his computer continued to suffer from the same problems he experienced prior to purchasing and running the software—namely, freezing up. Worse yet, the speed and performance of his computer actually began to deteriorate after using the software, to the point where he was often forced to "restart" his computer while performing simple functions—such as browsing the Internet or using word processing programs. Moreover, after installing and running System Suite, the frequency with which Worley's computer froze increased substantially—requiring hard-resets and/or forced shutdowns to regain use of his computer (i.e., removing the computer's power source).

52.     Worley reasonably relied upon Avanquest's representations about System Suite's utility, in that he believed the software would actually perform the operations described in its marketing materials and advertisements. But for these representations, Worley would not have purchased and continued to use the software.

**VII.   Plaintiff Boyd's Experience.**

53.     In or around January 2012, Plaintiff Johnny Boyd began to experience problems with his computer. Specifically, his computer's overall and Internet speeds drastically decreased, he began to receive numerous error messages on his computer screen, and the computer would often freeze.

54.     Accordingly, Boyd visited a local office supply store to search for software that would remedy his computer problems. At the store, Boyd encountered Avanquest's Fix-It Utilities Professional 12 software, and viewed Avanquest's representations about the software's utility located on its packaging materials, such as those described above, including its assertion that the

product will "Fix[] problems and speed[] up Windows" and "Stop[] PC Crashes and Freezes."

55.     Relying upon the packaging's representations, Boyd purchased Avanquest's Fix-It Utilities Professional 12 for $39.99. Boyd purchased Fix-It Utilities under the belief—created by Avanquest's misrepresentations—that the software would accurately scan his computer for issues and prevent his computer from continuing to malfunction as it had been.

56.     Upon running Fix-It Utilities for the first time, the software reported that the "Security," "Maintenance," and "Optimization" statuses of his computer were poor, and displayed graphical representations reflecting the same. Because Avanquest designed its software to *always* report these statuses, Boyd was misled into believing that his computer was riddled with errors that were causing it to malfunction—as no actual assessment of the computer occurred.

57.     Contrary to Avanquest's representations, the Fix-It Utilities software purchased by Boyd did not perform any of the beneficial functions as described on its packaging. In fact, far from repairing his computer, immediately after running the software and attempting to fix the so-called errors that it detected, Boyd's computer froze—forcing him to perform a hard-reset. When Boyd attempted to restart the computer he was presented with a system notification informing him that his computer was afflicted with a variety of system errors—all of which prohibited him from turning on his computer. Since then, Boyd's computer has remained inoperative. Boyd reasonably relied upon Avanquest's representations about Fix-It Utilities, in that he believed the software would actually perform the operations described above and restore his computer's functionality. But for these representations, Boyd would not have purchased the software.

## CLASS ALLEGATIONS

58.     **Class Definition**: Plaintiffs Worley and Boyd bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States that have purchased Fix-It Utilities Professional or System Suite PC Tune-Up & Repair.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors,

1   predecessors, and any entity in which the Defendant or their parents have a controlling interest and

2   their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to

3   whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons

4   who execute and file a timely request for exclusion, (4) persons whose claims in this matter have

5   been finally adjudicated on the merits or otherwise released, and (5) the legal representatives,

6   successors, or assigns of any such excluded person.

7       59.    **Numerosity**: The exact number of Class members is unknown to Plaintiffs at this

8   time, but on information and belief, Avanquest has sold its software to thousands of Class members

9   throughout the country, making joinder of each individual member impracticable. Ultimately, the

10  Class members will be easily identified through Avanquest's records.

11      60.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the

12  Class. Plaintiffs and the Class sustained damages as a result of Avanquest's uniform wrongful

13  conduct during transactions with Plaintiffs and the Class.

14      61.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and

15  protect the interests of the Class, and have retained counsel competent and experienced in complex

16  litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and

17  Avanquest has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to

18  vigorously prosecuting this action on behalf of the members of the Class, and have the financial

19  resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the

20  other members of the Class.

21      62.    **Commonality and Predominance**: Common questions of law and fact exist as to all

22  members of the Class and predominate over any questions affecting only individual members:

23          a)     whether Defendant intentionally designed the Scareware to invariably report

24                 that harmful errors and threats exist on a user's computer, regardless of the

25                 computer's actual condition;

26          b)     whether Defendant intentionally misrepresented the functionality of the

27

28

1      Scareware;

2          c)      whether Defendant's conduct described herein constitutes violations of

3                  California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et*

4                  *seq.*;

5          d)      whether Defendant's conduct described herein constitutes fraudulent

6                  inducement;

7          e)      whether Defendant's conduct described herein constitutes a breach of

8                  contract; and

9          f)      whether Defendant's conduct described herein constitutes a breach of implied

10                 covenant of good faith and fair dealing.

11     63.     **Superiority**: This class action is appropriate for certification because class

12     proceedings are superior to all other available methods for the fair and efficient adjudication of this

13     controversy and joinder of all members of the Class is impracticable. The damages suffered by the

14     individual members of the Class will likely be small relative to the burden and expense of

15     individual prosecution of the complex litigation necessitated by Avanquest's wrongful conduct.

16     Thus, it would be virtually impossible for the individual members of the Class to obtain effective

17     relief from Avanquest's misconduct. Even if members of the Class could sustain such individual

18     litigation, it would not be preferable to a class action because individual litigation would increase

19     the delay and expense to all parties due to the complex legal and factual controversies presented in

20     this Complaint. By contrast, a class action presents far fewer management difficulties and provides

21     the benefits of single adjudication, economies of scale, and comprehensive supervision by a single

22     court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be

23     ensured.

24     64.     **Policies Generally Applicable to the Class**: This class action is also appropriate for

25     certification because Avanquest has acted or refused to act on grounds generally applicable to the

26     Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

27

28

conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Avanquest's policies challenged herein apply and affect members of the Class uniformly and Plaintiffs' challenge of these policies hinges on Avanquest's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. Avanquest has acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

65.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned in discovery.

**FIRST CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On Behalf of Plaintiffs and the Class)**

66.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

67.     California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

68.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. A business practice need only meet one of the three criteria to be considered unfair competition.

69.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

70.     Likewise, the price of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a product is materially misleading.

71.     As described herein, Avanquest engaged in fraudulent and unfair business practices as defined by the UCL by, *inter alia*: (i) misrepresenting the Scareware's utility, including through

assertions such as those depicted in Figure 1 and as described above; (ii) misrepresenting the results
of the diagnostic scans (i.e., the overall condition of users' computers) through in-software
representations; (iii) using the misrepresentations to induce consumers into continuing to use the
Scareware; and (iv) selling Scareware that lacks the advertised utility, similarly produced false error
reports, and was otherwise incapable of functioning as Avanquest represented it would.

72.     Specifically, Avanquest affirmatively represented to Plaintiffs that the Scareware
would honestly and accurately scan their PCs for harmful problems, increase their PCs' speed and
stability, increase the speed of their Internet connection, and protect their PCs from harmful
programs. Further, through the Scareware itself, Avanquest affirmatively represented that Plaintiffs'
PC system statuses were low and that harmful errors existed on their PCs.

73.     The above affirmative representations, as well as the results of the "diagnostic scan"
provided by the software were, in fact, false. The Scareware did not perform an actual evaluation of
Plaintiffs' computers or any problems existing on them, and did not function as Avanquest
described.

74.     Avanquest violated the UCL's "fraudulent" prong by intentionally designing the
Scareware to report fake errors and misrepresent the system status of consumers' computers, with
the intent to defraud consumers into purchasing and continuing to use the Scareware. A reasonable
consumer was likely to rely, as Plaintiffs and the Class did, on Avanquest's misrepresentations
regarding the benefits offered by the Scareware. Moreover, Avanquest's misrepresentations were
likely to deceive reasonable consumers, and, in fact, did deceive Plaintiffs and the Class into
purchasing and continuing to use Scareware that lacked the advertised utility.

75.     Avanquest has also violated the UCL's "unfair" prong by causing substantial injury
to consumers through the conduct alleged above. The injuries caused by Avanquest's unfair
conduct are not outweighed by any countervailing benefits to consumers or competition, and could
not reasonably have been known by consumers. Given the information asymmetry between
Avanquest and consumers regarding the Scareware's functionality, Plaintiffs and the Class could

1   not reasonably have known of the falsity of Avanquest's representations or avoided the harm they

2   caused.

3          76.      Avanquest's fraudulent and unfair conduct occurred during the marketing and sale of

4   computer software products, and therefore occurred in the course of Avanquest's business practices.

5          77.      This conduct occurred out of and emanated from Defendant's Avanquest's offices

6   and headquarters located in California.

7          78.      Avanquest's fraudulent and unfair conduct directly and proximately caused Plaintiffs

8   and the Class actual monetary damages in the form of the price paid (or a portion thereof) for the

9   Scareware.

10         79.      Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order (1) requiring

11  Avanquest to cease the unfair and fraudulent practices described herein; (2) awarding Plaintiffs and

12  the Class all appropriate damages; and (3) awarding reasonable costs and attorneys' fees pursuant to

13  Cal. Code Civ. Proc. § 1021.5.

14                          **SECOND CAUSE OF ACTION**
                                **Fraudulent Inducement**
15                        **(On Behalf of Plaintiffs and the Class)**

16         80.      Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

17  herein.

18         81.      As depicted with particularity in the Figures above, and as described throughout all

19  Counts of this Complaint, Avanquest has used, and continues to use, marketing tactics it knows or

20  reasonably should know are false and misleading.

21         82.      To induce Plaintiffs into purchasing and continuing to use the Scareware, Avanquest

22  affirmatively represented to Plaintiffs that the Scareware provided a certain level of utility.

23  Specifically, Avanquest represented that the Scareware would honestly and accurately scan their

24  PCs for harmful problems, increase their PCs' speed and stability, increase the speed of their

25  Internet connection, protect their computers from harmful programs, and perform beneficial tasks

26  such as those depicted in Figure 1 and as described above. Further, through the Scareware itself,

27

28

1  Avanquest affirmatively represented that the system statuses of Plaintiffs' PCs were low and that

2  numerous errors existed on their PCs.

3      83.    Avanquest's affirmative representations were in fact false. In particular Avanquest's

4  Scareware does not increase a computer's performance and stability in the manner Avanquest

5  described, nor does it protect the user's security as represented. Likewise, Avanquest's

6  representations through the software itself were false; as the Scareware was not conducting credible

7  diagnostics of a computer's condition, it could not actually render meaningful reports regarding the

8  PC's status.

9      84.    The utility of a consumer product is a material term of any transaction because it

10  directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue

11  to use a product. Any deception or fraud related to the utility of a product is materially misleading.

12      85.    As the Scareware's developer, Avanquest knew that its representations about the

13  Scareware's utility were false. Avanquest intentionally designed its public representations to

14  mislead consumers about the Scareware's utility, and programmed the Scareware to falsely report

15  PC errors and to deceive users about their computers' system health.

16      86.    Avanquest made its misrepresentations specifically so as to induce Plaintiffs and the

17  Class to rely upon them by purchasing and continuing to use the software. Plaintiffs and the Class

18  did in fact rely upon these misrepresentations and purchased and continued to use the Scareware to

19  their detriment.

20      87.    As a consumer lacking the requisite technical expertise to independently gauge the

21  Scareware's underlying functionality, and taking Avanquest's statements at face value, Plaintiffs

22  justifiably relied upon Avanquest's misrepresentations and would not have purchased the Scareware

23  but for the misrepresentations that the Scareware would perform the beneficial tasks advertised.

24      88.    By using false and fraudulent marketing tactics to misrepresent the Scareware's

25  actual utility, and inducing Plaintiffs and the Class to purchase and continue to use the Scareware

26  based on those misrepresentations, Avanquest has engaged in fraudulent practices designed to

27

28

1    mislead and deceive consumers.

2         89.    As a result of relying on Avanquest's misrepresentations, Plaintiffs have been

3    damaged in the amount of the Scareware's purchase price, or at least a portion thereof.

4         90.    Plaintiffs therefore pray for relief in the amount of the purchase price (or a portion

5    thereof) of Avanquest's Scareware. Plaintiffs further allege that Avanquest's conduct and

6    misrepresentations were made with malice and in conscious disregard of Plaintiffs' rights, thereby

7    entitling them to punitive damages against Avanquest in an amount sufficient to deter such conduct

8    in the future.

9                            **THIRD CAUSE OF ACTION**
                              **Breach of Contract**
10                       **(On Behalf of Plaintiffs and the Class)**

11        91.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

12   herein.

13        92.    Plaintiffs and the Class members entered into agreements with Avanquest whereby

14   Avanquest agreed to sell, and Plaintiffs and the Class agreed to purchase, software that would detect

15   and remove legitimate computer errors from Plaintiffs' and the Class's computers, and perform the

16   beneficial tasks depicted in Figure 1 and described above.

17        93.    Based on the foregoing representations, Plaintiffs and the Class paid, and Avanquest

18   accepted, the Scareware's purchase price, and therefore performed their obligations under the

19   contracts.

20        94.    As such, Avanquest voluntarily assumed a contractual obligation to honestly

21   diagnose problems on Plaintiffs' and the Class's PCs and to honestly indicate whether problems

22   exist. This obligation is a material term of the agreement. Avanquest did not honor this obligation.

23        95.    Avanquest also assumed an obligation to provide Plaintiffs and the Class a product

24   that would remove errors from their PCs. Avanquest did not honor this obligation.

25        96.    Avanquest breached its contracts with Plaintiffs and the Class by failing to honestly

26   and accurately inform them about the true condition of their computers, and further by providing

27

28

1    software that failed to offer the benefits promised.

2        97.    The aforementioned breaches of contract have directly and proximately caused

3    Plaintiffs and the Class economic injury and other damages, because they purchased a product that

4    does not perform as Avanquest represented, and therefore lacks the promised and paid-for utility.

5                    **FOURTH CAUSE OF ACTION**
             **Breach of the Implied Covenant of Good Faith and Fair Dealing**
6                    **(On Behalf of Plaintiffs and the Class)**

7        98.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

8    herein.

9        99.    In order to benefit from Avanquest's supposed error and threat-removal software

10   products, Plaintiffs and the Class affirmatively allowed Avanquest to install the Scareware on their

11   computers.

12       100.   Avanquest's agreement to install software to diagnose and remove threats from

13   Plaintiffs' and the Class's PCs in the manner depicted in Figure 1 and as described above in

14   exchange for fees is a valid and enforceable contract between Plaintiffs and the Class on the one

15   hand, and Avanquest on the other.

16       101.   Avanquest breached the provisions of the agreement, specifically by not honoring its

17   responsibilities to perform truthful diagnostic and remedial operations.

18       102.   California law recognizes the implied covenant of good faith and fair dealing in

19   every contract.

20       103.   Implicit in the contract were provisions prohibiting Avanquest from engaging in

21   conduct that frustrated or injured Plaintiffs' and the Class's rights to receive the benefits of the

22   contract.

23       104.   Plaintiffs and the Class sought to receive the bargained-for benefit of obtaining a

24   software product that performed truthful diagnostic and remedial operations, as advertised by

25   Avanquest.

26       105.   Rather than provide the bargained-for benefit to Plaintiffs and the Class, Avanquest

27

28

1  produced software that falsely represented the condition of scanned computers and failed to perform

2  its advertised functions. Avanquest's conduct frustrated Plaintiffs' and the Class's rights to receive

3  the benefits of the contract by creating the illusion that the benefits were supplied (when in fact,

4  they were not), and leading Plaintiffs and the Class to believe that their contracts had been fulfilled.

5  106.   Avanquest's misconduct and breach of the implied covenant of good faith and fair

6  dealing as described herein resulted in injury to Plaintiffs and the Class in the form of price paid in

7  excess of the Scareware's actual utility and/or money conferred on Avanquest by Plaintiffs and the

8  Class, in exchange for fully functional software, that was knowingly and wrongfully retained by

9  Avanquest.

10  **PRAYER FOR RELIEF**

11  WHEREFORE, Plaintiffs Benson Worley and Johnny Boyd, on behalf of themselves and

12  the Class, respectfully request that this Court issue an order:

13  A.   Certifying this case as a class action on behalf of the Class defined above, appointing

14  Plaintiffs as class representatives, and appointing their counsel as class counsel;

15  B.   Declaring that Avanquest's actions, as set out above, violate California's Unfair

16  Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), and constitute fraudulent inducement,

17  breach of contract, and breach of the implied covenant of good faith and fair dealing;

18  C.   Awarding damages, including statutory and punitive damages where applicable, to

19  Plaintiffs and the Class in an amount to be determined at trial;

20  D.   Awarding injunctive and other equitable relief as is necessary to protect the interests

21  of the Class, including, *inter alia,* an order: (i) prohibiting Avanquest from engaging in the

22  wrongful and unlawful acts described herein, (ii) requiring Avanquest to disclose and admit the

23  wrongful and unlawful acts described herein, and (iii) requiring Avanquest to fully disclose the true

24  nature of its software products in the future;

25  E.   Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys'

26  fees;

27

28

1    F.    Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent

2  allowable;

3    G.    Entering such other injunctive and/or declaratory relief as is necessary to protect the

4  interests of Plaintiffs and the Class; and

5    H.    Awarding such other and further relief as the Court deems reasonable and just.

6                          **DEMAND FOR JURY TRIAL**

7    Plaintiffs demand a trial by jury for all issues so triable.

8                                    Respectfully submitted,

9                                    **BENSON WORLEY and JOHNNY BOYD**,
                                     individually and on behalf of all others similarly
10                                   situated,

11  Dated: February 22, 2013             By: /s/ Benjamin H. Richman
                                             One of Plaintiffs' Attorneys
12

13                                   JAY EDELSON (Admitted *Pro Hac Vice*)
                                     jedelson@edelson.com
14                                   RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
                                     rbalabanian@edelson.com
15                                   BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
                                     brichman@edelson.com
16                                   CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
                                     cgivens@edelson.com
17                                   EDELSON MCGUIRE, LLC
                                     350 North LaSalle, Suite 1300
18                                   Chicago, Illinois 60654
                                     Telephone: (312) 589-6370
19                                   Facsimile: (312) 589-6378

20                                   SEAN P. REIS (SBN 184044)
                                     sreis@edelson.com
21                                   EDELSON MCGUIRE, LLP
                                     30021 Tomas Street, Suite 300
22                                   Rancho Santa Margarita, California 92688
                                     Telephone: (949) 459-2124
23                                   Facsimile: (949) 459-2123

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Benjamin H. Richman, an attorney, hereby certify that on February 22, 2013, I served the above and foregoing ***Plaintiffs' First Amended Class Action Complaint***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this 22nd day of February, 2013.

/s/ Benjamin H. Richman