1   N. KATHLEEN STRICKLAND (SBN 64816)
    DEVIN C. COURTEAU (SBN 197505)
2   JUSTIN A. ZUCKER (SBN 284401)
    ROPERS, MAJESKI, KOHN & BENTLEY
3   150 Spear Street, Suite 850
    San Francisco, California 94105
4   Telephone:   (415) 543-4800
    Facsimile:   (415) 972-6301
5   Email:       kstrickland@rmkb.com
                 dcourteau@rmkb.com
6                jzucker@rmkb.com

7   Attorneys for Defendant
    AVANQUEST NORTH AMERICA INC.

8

9                     UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12  JOHNNY BOYD, individually and on        CASE NO.  3:12-CV-04391-WHO
    behalf of all other similarly situated,
13                                          **REQUEST FOR JUDICIAL NOTICE IN
                       Plaintiff,           SUPPORT OF DEFENDANT AVANQUEST
14                                          NORTH AMERICA INC.'S MOTION TO
    v.                                      STRIKE PORTIONS OF PLAINTIFF'S
15                                          SECOND AMENDED COMPLAINT**
    AVANQUEST NORTH AMERICA INC.,
16  a California Corporation,               Date:       December 17, 2014
                                            Time:       2:00 p.m.
17                     Defendant.           Judge:      Hon. William H. Orrick
                                            Courtroom:  2 (17th Floor)
18

19

20          In support of its Motion to Strike Portions of Plaintiff's Second Amended Complaint,

21  defendant AVANQUEST NORTH AMERICA INC. ("Avanquest") respectfully requests that this

22  Court take judicial notice of the following:

23          1.      First Amended Class Action Complaint, filed February 22, 2013, in *Worley, et al.*

24  *v. Avanquest North America Inc.*, in the Northern District of California, Case No. 12-cv-04391-

25  WHO (Dkt. No. 52), a true and correct file-endorsed copy of which is attached hereto as **Exhibit**

26  **1;**

27          2.      Class Action Complaint and Demand for Jury Trial, filed September 15, 2014, in

28  *Robinson v. Avanquest North America Inc. et al.*, in the Circuit Court of Cook County, Illinois,

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1   Case No. 14-ch-14861, a true and correct file-endorsed copy of which is attached hereto as

2   **Exhibit 2**;

3       3.    Order Denying Defendant's Motions to Dismiss and to Enforce Voluntary

4   Dismissal, and Granting Plaintiffs Leave to Amend (Dkt. No. 163), a true and correct file-

5   endorsed copy of which is attached hereto as **Exhibit 3**;

6       4.    Second Amended Class Action Complaint, filed October 21, 2014, in *Boyd, et al.*

7   *v. Avanquest North America Inc.*, in the Northern District of California, Case No. 12-cv-04391-

8   WHO (Dkt. No. 164), a true and correct file-endorsed copy of which is attached hereto as **Exhibit**

9   **4**; and

10       5.    The fact that Avanquest is headquartered in Calabasas, California, as shown by

11   Avanquest's California Secretary of State Business Entity Detail registration printout located at

12   http://kepler.sos.ca.gov/, a true and correct copy of which is attached hereto as **Exhibit 5**.

13       Judicial notice of Exhibits 1 – 4 is proper because they are records of state and/or federal

14   courts, and notice is being sought of the *fact* of the document, and the *fact* of its contents, not the

15   truth of the matters stated therein.  (Fed. R. Evid. 201; *Peel v. BrooksAmerica Mortg. Corp.*, 788

16   F.Supp.2d 1149, 1157-1158 (C.D.Cal. 2001), citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689

17   (9th Cir. 2001) ["matters of public record" judicially noticeable].)

18       Judicial notice of the fact that Avanquest's headquarters are in Calabasas, California and

19   Exhibit 5 is proper because the location of Avanquest's headquarters is not subject to reasonable

20   dispute in that it is generally known, and can be verified through reference to Avanquest's

21   California Secretary of State Business Entity Detail registration (Exhibit 5).  "The court may

22   judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known

23   within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from

24   sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also*, *United*

25   *States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002).

26   ///

27   ///

28   ///

1        Wherefore, Avanquest respectfully requests that this Court take judicial notice of Exhibits

2   1 – 5.

3        Respectfully Submitted,

4   Dated: November 10, 2014              ROPERS, MAJESKI, KOHN & BENTLEY

5

6                          By: __/s/ N. Kathleen Strickland_____

7                              N. KATHLEEN STRICKLAND
                             DEVIN C. COURTEAU

8                              JUSTIN A. ZUCKER
                             Attorneys for Defendant

9                              AVANQUEST NORTH AMERICA INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

---

# EXHIBIT 1

1

JAY EDELSON (Admitted *Pro Hac Vice*)
jedelson@edelson.com

2

RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com

3

BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
brichman@edelson.com

4

CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
cgivens@edelson.com

5

EDELSON MCGUIRE, LLC
350 North LaSalle, Suite 1300

6

Chicago, Illinois 60654
Telephone: (312) 589-6370

7

Facsimile: (312) 589-6378

8

SEAN P. REIS (SBN 184044)
sreis@edelson.com

9

EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300

10

Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124

11

Facsimile: (949) 459-2123

12

*Attorneys for Plaintiffs and the putative Class*

13

## IN THE UNITED STATES DISTRICT COURT

14

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

## SAN FRANCISCO DIVISION

16

BENSON WORLEY and JOHNNY BOYD,
individually and on behalf of all others similarly
situated,

17

18

*Plaintiffs,*

19

*v.*

20

AVANQUEST NORTH AMERICA INC., a
California corporation,

21

*Defendant.*

22

23

Case No. 3:12-cv-04391-SI

**FIRST AMENDED CLASS ACTION
COMPLAINT FOR:**

1. **Violations of California's Unfair
   Competition Law, Cal. Bus. & Prof.
   Code §§ 17200, *et seq.*;**
2. **Fraudulent Inducement;**
3. **Breach of Contract; and**
4. **Breach of the Implied Covenant of
   Good Faith and Fair Dealing.**

Judge: Honorable Susan Illston
Action Filed: August 21, 2012

24

25

26

27

28

Plaintiffs Benson Worley ("Worley") and Johnny Boyd ("Boyd") (collectively, "Plaintiffs") bring this First Amended Class Action Complaint ("Complaint") against Defendant Avanquest North America Inc. ("Avanquest" or "Defendant") for its practice of defrauding consumers through the deceptive design and sale of its software products. Plaintiffs, for their Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.      Avanquest is a multi-national developer of software products that it claims will increase the speed, performance, and stability of a consumer's personal computer ("PC"), protect against privacy risks, remove harmful errors, and improve Internet speeds. Unfortunately for consumers, however, Avanquest's methods of inducing consumers to purchase and continue to use its software, as well as the products' programmatic design, are highly deceptive.

2.      Through a common deceptive scheme, Avanquest uniformly defrauds consumers into purchasing and continuing to use the two products at issue in this lawsuit—Fix-It Utilities Professional ("Fix-It Utilities") and SystemSuite PC Tune-Up & Repair ("System Suite") (collectively, the "Scareware").

3.      The Scareware is available for purchase online through Avanquest's websites, third-party resellers, and in packaged form at brick-and-mortar stores such as Best Buy and Office Depot. Through the marketing materials contained on its websites, as well as the software's packaging itself, Avanquest represents that the Scareware will detect and repair a wide range of PC errors, privacy threats, viruses, and other computer problems. Avanquest also promises that the Scareware will increase system startup speeds, optimize a user's PC performance, and remove security risks.

4.      In reality, Avanquest's descriptions of the Scareware's utility serve as the initial phase of a fraudulent scheme to induce consumers into purchasing its products, and then to convince them into paying ongoing subscription fees to continue using the software.

5.      Although its software is technologically complex, the paradigm used by Avanquest

1    to defraud consumers is simple. First, Avanquest describes its Scareware as software that will

2    restore a PC's functionality by removing harmful errors, privacy threats, and increasing Internet

3    speeds. Induced by these representations, the consumer then purchases the Scareware. After

4    installing and running the Scareware, the consumer is encouraged to conduct a "diagnostic scan" to

5    assess the condition of his or her PC.

6         6.    The Scareware then invariably reports, in ominous fashion, that harmful problems

7    are lowering the PC's condition. Thereafter, the user is offered the ability to "fix" the PC by

8    removing the errors reported by the Scareware. However, as explained more fully herein, the

9    Scareware's diagnostics procedures do not perform any credible evaluation of consumers' PCs.

10   Instead, Avanquest intentionally designed the Scareware to invariably report that a user's PC needs

11   repair and is afflicted with harmful errors, privacy risks, and other problems—regardless of the

12   computer's actual condition. The average consumer logically assumes that errors detected through

13   this "diagnostic scan" correspond to the harmful problems identified by Avanquest's marketing

14   materials.

15        7.    The process described above is repeated each time a user runs the Scareware. Also of

16   significance is that the Scareware is offered on a yearly subscription basis. As such, the average

17   consumer (unaware of its deceptive nature) is convinced that the Scareware is detecting, reporting,

18   and repairing actual errors harming their PC's performance. Thus, because the Scareware was

19   designed to invariably "detect" harmful errors, the consumer is fraudulently induced into continuing

20   to renew his or her subscription (or not to seek a refund).

21        8.    Avanquest holds itself out as a reputable leader in the "utility software" industry—

22   i.e., software that enhances and or repairs a PC's functionality. Because average consumers lack the

23   requisite technical expertise to understand the underlying operations of Avanquest's software, they

24   trust the company to convey truthful information about its products, and for its products to honestly

25   and accurately identify and remove harmful errors from their PCs. Avanquest betrayed that trust,

26   and as a result thousands of consumers have been, and continue to be, tricked into paying for its

27

28

FIRST AMENDED COMPLAINT              3              CASE NO. 3:12-cv-04391-SI

1   unlawful Scareware.

2                 **PARTIES**

3      9.     Plaintiff Benson Worley is a natural person and citizen of the State of Wisconsin.

4     10.    Plaintiff Johnny Boyd is a natural person and citizen of the State of Georgia.

5     11.    Defendant Avanquest North America Inc. is a corporation incorporated in and

6   existing under the laws of the State of California, with its headquarters and principal place of

7   business located at 7031 Koll Center Parkway, Suite 150, Pleasanton, California 94566. Avanquest

8   conducts business throughout the State of California and the United States.

9             **JURISDICTION AND VENUE**

10     12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

11   because (a) at least one Class member is a citizen of a different state than Defendant, (b) the amount

12   in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions

13   under that subsection apply to this action.

14     13.    This Court has personal jurisdiction over Avanquest because it conducts business in

15   California and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or

16   emanated from California.

17     14.    More specifically, Avanquest's relevant operations, including its headquarters and

18   primary sales and marketing operations are located in California. Vital employees, such as

19   Avanquest's Director of Online Marketing, Vice President of Strategic Sales and Marketing,

20   Director of Business Development, and Vice President of eCommerce and Direct Marketing are all

21   located in California. Thus, Avanquest's decisions regarding the programmatic design of the

22   software, as well as the representations made about the Scareware's utility, emanated from

23   California.

24     15.    Venue is proper in this District because Avanquest maintains its headquarters in this

25   District and because the improper conduct alleged in this Complaint occurred in, was directed to,

26   and/or emanated from this District.

27

28

---

**INTRADISTRICT ASSIGNMENT**

16.     Pursuant to Civil Local Rule 3-2(d), this case has been assigned to the San Francisco Division.

**FACTUAL BACKGROUND**

**I.      A Brief Overview of Avanquest.**

17.     Founded in 1984 as French company BVRP Software, Avanquest[1] has today become a global leader in the PC utility software industry. Avanquest boasts that it is one of the "ten leading consumer software developers" in the world,[2] and asserts that its mission is to design software to "provide a more secure and enjoyable experience to people looking for easy and affordable software solutions in everyday life."[3]

18.     According to Avanquest, Fix-It Utilities and System Suite are its "#1 selling disk utility" and "Anti-virus/Anti-spyware" products. Avanquest claims that these software products offer a "complete package" that "make it easy to diagnose and fix your computer."

**II.     Fix-It Utilities Professional and SystemSuite PC Tune-Up & Repair are Substantially the Same Product.**

19.     While different in name, each Scareware product at issue here is substantially similar in functionality and design; so much so that Avanquest's marketing describes both Fix-it Utilities and System Suite as providing the same features and even created a single instruction manual for the two. *See* Figures 1-2 on the following page (showing screenshots of an Avanquest advertisement marketing the two products as having the same functionality, and the 'User Guide' included with purchase of the products).

---

[1]     In 1996, Defendant formed BVRP USA, which was later renamed Avanquest North America Inc.
[2]     Corporate Profile, http://www.avanquest.com/USA/corporate/company/history.html (last visited February 22, 2013).
[3]     Mission and Values, http://www.avanquest.com/USA/corporate/company/mission_and_values.html (last visited February 22, 2013).



(Figure 1.)



(Figure 2.)

20.     Additionally, and even to the untrained eye, a side-by-side comparison of the user interfaces from Fix-It Utilities and SystemSuite confirms that—aside from product name—the two appear virtually identical. *See* Figure 3 on following page (showing screenshots of Fix-It Utilities' and SystemSuite's initial graphical user interfaces).



(Figure 3.)

## III.   Avanquest Tricks Consumers into Purchasing its Scareware Through a Common Deceptive Scheme.

21.    A consumer searching the World Wide Web for software to repair a damaged computer, protect against privacy threats, or generally increase the speed or performance of a PC will likely encounter advertisements for Avanquest's Scareware. Clicking on the advertisement re-directs the individual to Avanquest's website, which contains representations about the Scareware's utility.

22.    For example, a consumer viewing Avanquest's website is presented with the following descriptions about the Scareware's functional capabilities:

- "Fix, Speed Up & Maintain Your PC";
- "One-Step PC Tool Wizards Make It Easy To Diagnose & Fix Your Computer";
- "40+ PC Tune Up Tools Scan, Identify & Fix PC Problems"; and
- "One-Click uncovers problems, helps you fix them & returns your PC to peak performance."

23.    These same representations are also found on the Scareware's physical packaging. In particular, the above assertions are strategically located on both sides of the products' boxes, such that consumers contemplating purchase can first read about their purported functionalities.

24.    Through these marketing materials, Avanquest also presents the consumer with

1   representations designed to frighten them into believing that their computer is at serious risk. For

2   instance, Avanquest warns that:

3          • "The PC errors, crashes and freezes you're experiencing are generally caused

4              by faulty settings, broken registry settings and hard drive problems, which

5              unfortunately, come with regular PC use"; and

6          • "Every day you work, play or browse on your computer, useless junk builds

7              up clutter on your hard drive. Unfortunately, clutter causes damaging disk

8              and system problems and ultimately can create dangerous privacy problems."

9       25.    Regardless of where the consumer encounters these statements, Avanquest

10  encourages the consumer to download or purchase the products to protect their computers.

11      **A.    Avanquest uniformly misrepresents the utility of its Scareware.**

12      26.    On its websites, as well as on the Scareware products' packaging (as indicated

13  above), Avanquest displays specific affirmations about the Scareware's functionality. Avanquest

14  generally asserts that its Scareware will improve the efficiency and performance of PCs, increase

15  system stability, repair errors, stop PC crashes and freezes, and serve as a comprehensive tool to fix

16  computer problems.

17      27.    More specifically, Avanquest represents through its website (www.avanquest.com)

18  that the Fix-It Utilities and System Suite products are designed to:

19          • "Clean, fix and optimize the Windows Registry";

20          • "Stop PC Crashes and Freezes";

21          • "Repair System Errors";

22          • "Optimize Internet speed and memory";

23          • "[Provide] Total Virus and Spyware Protection"; and

24          • "[Provide] Complete PC Maintenance."

25      28.    On its website, Avanquest further asserts that "with Fix-It Utilities and System

26  Suite's award-winning integrated technology[,] you'll get complete Virus Protection" that will

27

28

FIRST AMENDED COMPLAINT                          8                    CASE NO. 3:12-cv-04391-SI

"[r]emove existing viruses, malware and spyware from your PC, plus prevent future infections without sacrificing speed and performance." Avanquest also states that "Fix-it Utilities runs hundreds of comprehensive diagnostic tests for you and will have your PC running like new all over again."

29.     Likewise, on its System Suite PC Tune-Up & Repair 12 retail product packaging, Avanquest asserts that the product will:

- "Fix Windows Problems";
- "Speed Up PC Start Time";
- "[Provide] Malware, Virus, and Spyware Protection";
- "[Provide] PC Diagnostics and Maintenance";
- "Eliminate PC Crashes and Freezes"; and
- "Clean and Repair Windows Registry."

30.     The same goes for Fix-It Utilities Professional 12's packaging, which claims that the product:

- "Keeps your PC running like new";
- "Intelligently identifies system slowdowns";
- "Fixes problems and speeds up Windows";
- "[Provides] Real time virus and spyware protection"; and
- "Stops PC Crashes and Freezes."

31.     But these representations do not accurately reflect the Scareware's true capabilities. The truth is that, irrespective of its "anti-virus" feature,[4] Fix-It Utilities and System Suite primarily perform only two main functions: they are registry cleaners and they remove superfluous "temporary" files from a user's hard drive. These operations do not come close to squaring with Avanquest's representations about the functionality of the Scareware. For instance, as discussed

---

[4]     Avanquest claims that its Scareware also provides "total virus protection," but Plaintiffs have their doubts about the anti-virus feature as well. In certain instances Plaintiffs' expert was able to demonstrate that although the Scareware *detected* a harmful virus, it did not actually remove it. Despite this, the Scareware reported the virus had been deleted.

1    more fully below, neither of these functions will remove damaging PC errors, appreciably improve

2    a computer's boot time, nor prevent the common causes of system freezes.

3        32.    Because of the impression created by Avanquest's affirmations of fact about the

4    Scareware's utility, consumers rightfully believe that Avanquest's software will detect the errors

5    and problems identified above. To validate this belief, Avanquest designed the Scareware to appear

6    as though it's performing actual analyses of consumers' PCs. This facade, however, is simply the

7    next phase of Avanquest's scheme.

8        **B.    Avanquest falsely informs consumers that their computers need repair, without
             conducting any credible evaluation of their PCs' condition.**

9

10       33.    Upon purchasing, installing, and running the Scareware for the first time, a display

11   screen is presented to the user indicating that the computer "is not optimized." *See* Figure 4

12   (showing screenshots of Fix-It Utilities' and System Suite's initial graphical user interfaces).

13
14
15   
16
17
18
19

20   (Figure 4.)

21       34.    Clicking on the "Problems" section located on the Scareware's navigation bar

22   triggers a display warning the user that "[x] amount of problems are affecting your PC's health and

23   security" accompanied by an itemized list of problems that it claims are afflicting the computer, all

24   of which (upon further inspection) refer only to the users' failure to have run the Scareware on their

25   computer in the past, but not to any diagnoses of errors or problems actually existing on the

26   computer. *See* Figure 5 (showing screenshots of Fix-It Utilities' and System Suite's error reporting

27   interfaces *before* performing a diagnostic scan).

28

---

FIRST AMENDED COMPLAINT                    10                    CASE NO. 3:12-cv-04391-SI



(Figure 5.)

35.     After warning the user that their computer is not optimized and is afflicted by serious

problems, the Scareware advises the user to conduct a diagnostic scan by pressing "Analyze Now"

or "One-Click Fix All."

36.     Upon completion of the diagnostic "scan," the Scareware renders an ominous

graphical depiction of an alert sign showing that a number of serious "problems" exist on the

computer and require fixing. *See* Figure 6 (showing screenshots of Fix-It Utilities' and System

Suite's error reporting interfaces). In addition to this warning, the Scareware displays a visual

representation of three cylinders, labeled "Optimization," "Security," and "Maintenance," with

color spectrums ranging from red to green, along with corresponding percentages supposedly

representing the results of an analysis of the computer's condition. *See id.*



(Figure 6.)

37.     While these visual and textual representations appear alarming to the user, the truth

is that Avanquest designed the Scareware to report these conditions without *any* real evaluation of

the computer's condition. In this way, the user believes that the Scareware is actually detecting and reporting harmful errors, presumably associated with the errors that Avanquest represented the software would remedy.

## IV.   Plaintiffs' Expert Uncovers that Avanquest Designed its Scareware to Invariably Report Benign Errors as Harmful.

38.     On the surface, it appears as if the software is actually detecting, reporting, and repairing errors that threaten the operations of a user's PC. In reality, however, Avanquest intentionally designed its Scareware to vastly overstate both the amount and severity of errors that the software purportedly fixes in an effort to convince consumers that it functions as advertised—i.e., that it actually detects and removes credible threats and PC problems.

39.     Through their attorneys, Plaintiffs have engaged a computer forensics expert to examine Avanquest's Scareware.[5] The results of this investigation confirm that the software always reports that a user's PC is in poor condition—regardless of the condition or type of computer the software is installed on. For instance, the Scareware's results shown in Figure 6 above were produced after conducting a diagnostic scan on a *brand new computer*. Ostensibly these representations scare the user into believing that the PC is damaged or at risk, and that continued use of the Scareware is necessary to "fix" these problems. The facts show otherwise. Plaintiffs' expert has determined that, by any stretch of the imagination, many of the errors detected *are not credible threats* to a PC's functionality.

40.     In relevant part, the expert's investigation uncovered that Avanquest programmed its Scareware to (i) always identify problems on a user's computer (even when none exist), (ii) artificially inflate the number of errors detected on a user's computer, (iii) characterize innocuous items as harmful threats, and (iv) arbitrarily report that the user's "Optimization," "Security," and "Maintenance" statuses are low without using any credible metrics to assess these issues.

41.     The expert's research also shows that the Scareware was deliberately designed to

---
[5]     All forensic testing described herein was performed on both the Fix-It Utilities and System Suite software. Because the functionality of the two products and the results of such tests were nearly identical, they are discussed collectively unless otherwise indicated.

1  mischaracterize the severity of errors to shock consumers into believing that their computers are

2  damaged. For instance, the expert confirmed that the software detected a number of innocuous and

3  benign files that *cannot* cause damage to a computer and reported that they were negatively

4  impacting the computer's performance.

5       42.    Through the deceptive scheme described herein, Avanquest has profited, and

6  continues to profit, by defrauding consumers into believing that their PCs are severely damaged

7  and/or at risk, and that the purchase and continued use of its Scareware is necessary to "fix" these

8  problems. But, because the software does not actually provide the benefits advertised, Avanquest

9  does not deliver on its promises to its users.

10  **V.    Avanquest is Not Alone in its Fraudulent Conduct.**

11       43.    Unfortunately for consumers, Avanquest is not alone in its use of the sorts of

12  fraudulent programmatic design and marketing practices at issue in this case. Rather, the utility

13  software industry has been fraught with these tactics for over a decade. It is only recently, however,

14  that software developers—like Avanquest and its competitors—have been called to account for

15  their profiting off of consumers who are unable to identify the fraudulent technological design and

16  methodologies underlying this type of supposedly performance-enhancing software.

17       44.    Indeed, numerous lawsuits have been filed against well-known competitors of

18  Avanquest (e.g., Symantec Corp. and AVG Technologies)—including several by Plaintiffs' counsel

19  here—alleging similar claims related to the fraudulent design and marketing of so-called utility

20  software products. Several of those cases have resulted in classwide settlements and industry-

21  changing modifications to the software products at issue—making their detection, reporting and

22  repairing mechanisms far more transparent and more accurate when it comes to informing

23  consumers of the threats posed by existing errors on their computers—and still others are being

24  actively litigated. Rather than make the necessary changes to its software so that it *actually* detects,

25  reports and repairs harmful errors and problems on users' PCs, Avanquest continues to profit

26  through its fraudulent conduct

27

28

---

FIRST AMENDED COMPLAINT             13            CASE NO. 3:12-cv-04391-SI

**VI.      Plaintiff Worley's Experience.**

45.      In early 2012, Plaintiff Benson Worley began to experience problems with his computer. Specifically, Worley's computer would occasionally "freeze up" and malfunction.

46.      Accordingly, Worley visited his local Wal-Mart retailer to search for software that would remedy his computer problems. At the store, Plaintiff discovered Avanquest's System Suite PC Tune-Up & Repair 12 software, and viewed Defendant's representations about the software's utility located on its box and packaging materials, such as those described above, including its assertion that the product will "Eliminate PC Crashes and Freezes."

47.      Relying upon the packaging's representations, Worley purchased Avanquest's System Suite PC Tune-Up & Repair 12 for $35.00. Plaintiff purchased System Suite under the belief—created by Avanquest's misrepresentations—that the software would accurately scan his computer for issues and prevent his computer from continuing to malfunction.

48.      Upon running System Suite PC Tune-Up & Repair 12 for the first time, the software reported that Worley's computer was afflicted with hundreds of errors, that the "Security," "Maintenance," and "Optimization" statuses of his computer were poor, and that it displayed graphical representations reflecting the same. Because Avanquest designed its software to *always* report these statuses, Worley was misled into believing that his computer was riddled with errors that were causing it to malfunction—although no actual assessment of the computer occurred.

49.      Through the software's design, Avanquest deceived Worley into thinking the Scareware was making meaningful repairs to his PC, thus he elected to continue using the program rather than ever seeking a refund. Worley was further deceived by the software's representations that it was removing harmful errors and threats from his computer.

50.      In reality, as described above, System Suite did not actually detect hundreds of errors as Avanquest claimed because the software arbitrarily reported problems as serious and cannot actually perform the beneficial tasks described in its marketing materials and advertisements. Nor did the software accurately identify and report the actual condition of Worley's computer. As such,

1    Worley was misled into believing that his computer was at-risk, and that he needed to continue to

2    use System Suite in order to repair it.

3         51.    In fact, every time Worley ran System Suite, the software reported that harmful

4    errors were adversely affecting his computer and that he needed to "fix" the errors using System

5    Suite. Yet, despite the fact that he repeatedly ran System Suite's scan, and purportedly "fixed" the

6    reported errors, his computer continued to suffer from the same problems he experienced prior to

7    purchasing and running the software—namely, freezing up. Worse yet, the speed and performance

8    of his computer actually began to deteriorate after using the software, to the point where he was

9    often forced to "restart" his computer while performing simple functions—such as browsing the

10   Internet or using word processing programs. Moreover, after installing and running System Suite,

11   the frequency with which Worley's computer froze increased substantially—requiring hard-resets

12   and/or forced shutdowns to regain use of his computer (i.e., removing the computer's power

13   source).

14        52.    Worley reasonably relied upon Avanquest's representations about System Suite's

15   utility, in that he believed the software would actually perform the operations described in its

16   marketing materials and advertisements. But for these representations, Worley would not have

17   purchased and continued to use the software.

18   **VII.   Plaintiff Boyd's Experience.**

19        53.    In or around January 2012, Plaintiff Johnny Boyd began to experience problems with

20   his computer. Specifically, his computer's overall and Internet speeds drastically decreased, he

21   began to receive numerous error messages on his computer screen, and the computer would often

22   freeze.

23        54.    Accordingly, Boyd visited a local office supply store to search for software that

24   would remedy his computer problems. At the store, Boyd encountered Avanquest's Fix-It Utilities

25   Professional 12 software, and viewed Avanquest's representations about the software's utility

26   located on its packaging materials, such as those described above, including its assertion that the

27

28

product will "Fix[] problems and speed[] up Windows" and "Stop[] PC Crashes and Freezes."

55.     Relying upon the packaging's representations, Boyd purchased Avanquest's Fix-It Utilities Professional 12 for $39.99. Boyd purchased Fix-It Utilities under the belief—created by Avanquest's misrepresentations—that the software would accurately scan his computer for issues and prevent his computer from continuing to malfunction as it had been.

56.     Upon running Fix-It Utilities for the first time, the software reported that the "Security," "Maintenance," and "Optimization" statuses of his computer were poor, and displayed graphical representations reflecting the same. Because Avanquest designed its software to *always* report these statuses, Boyd was misled into believing that his computer was riddled with errors that were causing it to malfunction—as no actual assessment of the computer occurred.

57.     Contrary to Avanquest's representations, the Fix-It Utilities software purchased by Boyd did not perform any of the beneficial functions as described on its packaging. In fact, far from repairing his computer, immediately after running the software and attempting to fix the so-called errors that it detected, Boyd's computer froze—forcing him to perform a hard-reset. When Boyd attempted to restart the computer he was presented with a system notification informing him that his computer was afflicted with a variety of system errors—all of which prohibited him from turning on his computer. Since then, Boyd's computer has remained inoperative. Boyd reasonably relied upon Avanquest's representations about Fix-It Utilities, in that he believed the software would actually perform the operations described above and restore his computer's functionality. But for these representations, Boyd would not have purchased the software.

## CLASS ALLEGATIONS

58.     **Class Definition**: Plaintiffs Worley and Boyd bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States that have purchased Fix-It Utilities Professional or System Suite PC Tune-Up & Repair.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors,

1    predecessors, and any entity in which the Defendant or their parents have a controlling interest and

2    their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to

3    whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons

4    who execute and file a timely request for exclusion, (4) persons whose claims in this matter have

5    been finally adjudicated on the merits or otherwise released, and (5) the legal representatives,

6    successors, or assigns of any such excluded person.

7         59.    **Numerosity**: The exact number of Class members is unknown to Plaintiffs at this

8    time, but on information and belief, Avanquest has sold its software to thousands of Class members

9    throughout the country, making joinder of each individual member impracticable. Ultimately, the

10   Class members will be easily identified through Avanquest's records.

11        60.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the

12   Class. Plaintiffs and the Class sustained damages as a result of Avanquest's uniform wrongful

13   conduct during transactions with Plaintiffs and the Class.

14        61.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and

15   protect the interests of the Class, and have retained counsel competent and experienced in complex

16   litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and

17   Avanquest has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to

18   vigorously prosecuting this action on behalf of the members of the Class, and have the financial

19   resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the

20   other members of the Class.

21        62.    **Commonality and Predominance**: Common questions of law and fact exist as to all

22   members of the Class and predominate over any questions affecting only individual members:

23              a)    whether Defendant intentionally designed the Scareware to invariably report

24                    that harmful errors and threats exist on a user's computer, regardless of the

25                    computer's actual condition;

26              b)    whether Defendant intentionally misrepresented the functionality of the

27

28

---

1      Scareware;

2         c)    whether Defendant's conduct described herein constitutes violations of

3               California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et*

4               *seq.*;

5         d)    whether Defendant's conduct described herein constitutes fraudulent

6               inducement;

7         e)    whether Defendant's conduct described herein constitutes a breach of

8               contract; and

9         f)    whether Defendant's conduct described herein constitutes a breach of implied

10              covenant of good faith and fair dealing.

11     63.    **Superiority**: This class action is appropriate for certification because class

12 proceedings are superior to all other available methods for the fair and efficient adjudication of this

13 controversy and joinder of all members of the Class is impracticable. The damages suffered by the

14 individual members of the Class will likely be small relative to the burden and expense of

15 individual prosecution of the complex litigation necessitated by Avanquest's wrongful conduct.

16 Thus, it would be virtually impossible for the individual members of the Class to obtain effective

17 relief from Avanquest's misconduct. Even if members of the Class could sustain such individual

18 litigation, it would not be preferable to a class action because individual litigation would increase

19 the delay and expense to all parties due to the complex legal and factual controversies presented in

20 this Complaint. By contrast, a class action presents far fewer management difficulties and provides

21 the benefits of single adjudication, economies of scale, and comprehensive supervision by a single

22 court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be

23 ensured.

24     64.    **Policies Generally Applicable to the Class**: This class action is also appropriate for

25 certification because Avanquest has acted or refused to act on grounds generally applicable to the

26 Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

27

28

FIRST AMENDED COMPLAINT                    18                    CASE NO. 3:12-cv-04391-SI

1  conduct toward the members of the Class, and making final injunctive relief appropriate with

2  respect to the Class as a whole. Avanquest's policies challenged herein apply and affect members of

3  the Class uniformly and Plaintiffs' challenge of these policies hinges on Avanquest's conduct with

4  respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. Avanquest has

5  acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the

6  Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct

7  toward members of the Class.

8       65.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class

9  Definition" based on facts learned in discovery.

10       **FIRST CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**

11  **Cal. Bus. & Prof. Code §§ 17200, et seq.**
**(On Behalf of Plaintiffs and the Class)**

12

13       66.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

14

15       67.     California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et*

*seq.*, protects both consumers and competitors by promoting fair competition in commercial

16

17  markets for goods and services.

18       68.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. A

business practice need only meet one of the three criteria to be considered unfair competition.

19

20       69.     The utility of a consumer product is a material term of any transaction because it

directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any

21

22  deception or fraud related to the utility of a product is materially misleading.

23       70.     Likewise, the price of a consumer product is a material term of any transaction

because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a

24

product. Any deception or fraud related to the price of a product is materially misleading.

25

26       71.     As described herein, Avanquest engaged in fraudulent and unfair business practices

as defined by the UCL by, *inter alia*: (i) misrepresenting the Scareware's utility, including through

27

28

---

1   assertions such as those depicted in Figure 1 and as described above; (ii) misrepresenting the results

2   of the diagnostic scans (i.e., the overall condition of users' computers) through in-software

3   representations; (iii) using the misrepresentations to induce consumers into continuing to use the

4   Scareware; and (iv) selling Scareware that lacks the advertised utility, similarly produced false error

5   reports, and was otherwise incapable of functioning as Avanquest represented it would.

6         72.     Specifically, Avanquest affirmatively represented to Plaintiffs that the Scareware

7   would honestly and accurately scan their PCs for harmful problems, increase their PCs' speed and

8   stability, increase the speed of their Internet connection, and protect their PCs from harmful

9   programs. Further, through the Scareware itself, Avanquest affirmatively represented that Plaintiffs'

10  PC system statuses were low and that harmful errors existed on their PCs.

11        73.     The above affirmative representations, as well as the results of the "diagnostic scan"

12  provided by the software were, in fact, false. The Scareware did not perform an actual evaluation of

13  Plaintiffs' computers or any problems existing on them, and did not function as Avanquest

14  described.

15        74.     Avanquest violated the UCL's "fraudulent" prong by intentionally designing the

16  Scareware to report fake errors and misrepresent the system status of consumers' computers, with

17  the intent to defraud consumers into purchasing and continuing to use the Scareware. A reasonable

18  consumer was likely to rely, as Plaintiffs and the Class did, on Avanquest's misrepresentations

19  regarding the benefits offered by the Scareware. Moreover, Avanquest's misrepresentations were

20  likely to deceive reasonable consumers, and, in fact, did deceive Plaintiffs and the Class into

21  purchasing and continuing to use Scareware that lacked the advertised utility.

22        75.     Avanquest has also violated the UCL's "unfair" prong by causing substantial injury

23  to consumers through the conduct alleged above. The injuries caused by Avanquest's unfair

24  conduct are not outweighed by any countervailing benefits to consumers or competition, and could

25  not reasonably have been known by consumers. Given the information asymmetry between

26  Avanquest and consumers regarding the Scareware's functionality, Plaintiffs and the Class could

27

28

1   not reasonably have known of the falsity of Avanquest's representations or avoided the harm they

2   caused.

3        76.    Avanquest's fraudulent and unfair conduct occurred during the marketing and sale of

4   computer software products, and therefore occurred in the course of Avanquest's business practices.

5        77.    This conduct occurred out of and emanated from Defendant's Avanquest's offices

6   and headquarters located in California.

7        78.    Avanquest's fraudulent and unfair conduct directly and proximately caused Plaintiffs

8   and the Class actual monetary damages in the form of the price paid (or a portion thereof) for the

9   Scareware.

10        79.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order (1) requiring

11   Avanquest to cease the unfair and fraudulent practices described herein; (2) awarding Plaintiffs and

12   the Class all appropriate damages; and (3) awarding reasonable costs and attorneys' fees pursuant to

13   Cal. Code Civ. Proc. § 1021.5.

14                   **SECOND CAUSE OF ACTION**
                      **Fraudulent Inducement**

15             **(On Behalf of Plaintiffs and the Class)**

16        80.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

17   herein.

18        81.    As depicted with particularity in the Figures above, and as described throughout all

19   Counts of this Complaint, Avanquest has used, and continues to use, marketing tactics it knows or

20   reasonably should know are false and misleading.

21        82.    To induce Plaintiffs into purchasing and continuing to use the Scareware, Avanquest

22   affirmatively represented to Plaintiffs that the Scareware provided a certain level of utility.

23   Specifically, Avanquest represented that the Scareware would honestly and accurately scan their

24   PCs for harmful problems, increase their PCs' speed and stability, increase the speed of their

25   Internet connection, protect their computers from harmful programs, and perform beneficial tasks

26   such as those depicted in Figure 1 and as described above. Further, through the Scareware itself,

27

28

---

FIRST AMENDED COMPLAINT                 21                  CASE NO. 3:12-cv-04391-SI

1    Avanquest affirmatively represented that the system statuses of Plaintiffs' PCs were low and that

2    numerous errors existed on their PCs.

3          83.    Avanquest's affirmative representations were in fact false. In particular Avanquest's

4    Scareware does not increase a computer's performance and stability in the manner Avanquest

5    described, nor does it protect the user's security as represented. Likewise, Avanquest's

6    representations through the software itself were false; as the Scareware was not conducting credible

7    diagnostics of a computer's condition, it could not actually render meaningful reports regarding the

8    PC's status.

9          84.    The utility of a consumer product is a material term of any transaction because it

10   directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue

11   to use a product. Any deception or fraud related to the utility of a product is materially misleading.

12         85.    As the Scareware's developer, Avanquest knew that its representations about the

13   Scareware's utility were false. Avanquest intentionally designed its public representations to

14   mislead consumers about the Scareware's utility, and programmed the Scareware to falsely report

15   PC errors and to deceive users about their computers' system health.

16         86.    Avanquest made its misrepresentations specifically so as to induce Plaintiffs and the

17   Class to rely upon them by purchasing and continuing to use the software. Plaintiffs and the Class

18   did in fact rely upon these misrepresentations and purchased and continued to use the Scareware to

19   their detriment.

20         87.    As a consumer lacking the requisite technical expertise to independently gauge the

21   Scareware's underlying functionality, and taking Avanquest's statements at face value, Plaintiffs

22   justifiably relied upon Avanquest's misrepresentations and would not have purchased the Scareware

23   but for the misrepresentations that the Scareware would perform the beneficial tasks advertised.

24         88.    By using false and fraudulent marketing tactics to misrepresent the Scareware's

25   actual utility, and inducing Plaintiffs and the Class to purchase and continue to use the Scareware

26   based on those misrepresentations, Avanquest has engaged in fraudulent practices designed to

27

28

1    mislead and deceive consumers.

2        89.    As a result of relying on Avanquest's misrepresentations, Plaintiffs have been

3    damaged in the amount of the Scareware's purchase price, or at least a portion thereof.

4        90.    Plaintiffs therefore pray for relief in the amount of the purchase price (or a portion

5    thereof) of Avanquest's Scareware. Plaintiffs further allege that Avanquest's conduct and

6    misrepresentations were made with malice and in conscious disregard of Plaintiffs' rights, thereby

7    entitling them to punitive damages against Avanquest in an amount sufficient to deter such conduct

8    in the future.

9                              **THIRD CAUSE OF ACTION**
                                  **Breach of Contract**
10                          **(On Behalf of Plaintiffs and the Class)**

11       91.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

12   herein.

13       92.    Plaintiffs and the Class members entered into agreements with Avanquest whereby

14   Avanquest agreed to sell, and Plaintiffs and the Class agreed to purchase, software that would detect

15   and remove legitimate computer errors from Plaintiffs' and the Class's computers, and perform the

16   beneficial tasks depicted in Figure 1 and described above.

17       93.    Based on the foregoing representations, Plaintiffs and the Class paid, and Avanquest

18   accepted, the Scareware's purchase price, and therefore performed their obligations under the

19   contracts.

20       94.    As such, Avanquest voluntarily assumed a contractual obligation to honestly

21   diagnose problems on Plaintiffs' and the Class's PCs and to honestly indicate whether problems

22   exist. This obligation is a material term of the agreement. Avanquest did not honor this obligation.

23       95.    Avanquest also assumed an obligation to provide Plaintiffs and the Class a product

24   that would remove errors from their PCs. Avanquest did not honor this obligation.

25       96.    Avanquest breached its contracts with Plaintiffs and the Class by failing to honestly

26   and accurately inform them about the true condition of their computers, and further by providing

27

28

1    software that failed to offer the benefits promised.

2        97.    The aforementioned breaches of contract have directly and proximately caused

3    Plaintiffs and the Class economic injury and other damages, because they purchased a product that

4    does not perform as Avanquest represented, and therefore lacks the promised and paid-for utility.

5                              **FOURTH CAUSE OF ACTION**
                **Breach of the Implied Covenant of Good Faith and Fair Dealing**
6                        **(On Behalf of Plaintiffs and the Class)**

7        98.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

8    herein.

9        99.    In order to benefit from Avanquest's supposed error and threat-removal software

10   products, Plaintiffs and the Class affirmatively allowed Avanquest to install the Scareware on their

11   computers.

12       100.   Avanquest's agreement to install software to diagnose and remove threats from

13   Plaintiffs' and the Class's PCs in the manner depicted in Figure 1 and as described above in

14   exchange for fees is a valid and enforceable contract between Plaintiffs and the Class on the one

15   hand, and Avanquest on the other.

16       101.   Avanquest breached the provisions of the agreement, specifically by not honoring its

17   responsibilities to perform truthful diagnostic and remedial operations.

18       102.   California law recognizes the implied covenant of good faith and fair dealing in

19   every contract.

20       103.   Implicit in the contract were provisions prohibiting Avanquest from engaging in

21   conduct that frustrated or injured Plaintiffs' and the Class's rights to receive the benefits of the

22   contract.

23       104.   Plaintiffs and the Class sought to receive the bargained-for benefit of obtaining a

24   software product that performed truthful diagnostic and remedial operations, as advertised by

25   Avanquest.

26       105.   Rather than provide the bargained-for benefit to Plaintiffs and the Class, Avanquest

27

28

1   produced software that falsely represented the condition of scanned computers and failed to perform

2   its advertised functions. Avanquest's conduct frustrated Plaintiffs' and the Class's rights to receive

3   the benefits of the contract by creating the illusion that the benefits were supplied (when in fact,

4   they were not), and leading Plaintiffs and the Class to believe that their contracts had been fulfilled.

5          106.    Avanquest's misconduct and breach of the implied covenant of good faith and fair

6   dealing as described herein resulted in injury to Plaintiffs and the Class in the form of price paid in

7   excess of the Scareware's actual utility and/or money conferred on Avanquest by Plaintiffs and the

8   Class, in exchange for fully functional software, that was knowingly and wrongfully retained by

9   Avanquest.

10                              **PRAYER FOR RELIEF**

11         WHEREFORE, Plaintiffs Benson Worley and Johnny Boyd, on behalf of themselves and

12   the Class, respectfully request that this Court issue an order:

13         A.      Certifying this case as a class action on behalf of the Class defined above, appointing

14   Plaintiffs as class representatives, and appointing their counsel as class counsel;

15         B.      Declaring that Avanquest's actions, as set out above, violate California's Unfair

16   Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), and constitute fraudulent inducement,

17   breach of contract, and breach of the implied covenant of good faith and fair dealing;

18         C.      Awarding damages, including statutory and punitive damages where applicable, to

19   Plaintiffs and the Class in an amount to be determined at trial;

20         D.      Awarding injunctive and other equitable relief as is necessary to protect the interests

21   of the Class, including, *inter alia,* an order: (i) prohibiting Avanquest from engaging in the

22   wrongful and unlawful acts described herein, (ii) requiring Avanquest to disclose and admit the

23   wrongful and unlawful acts described herein, and (iii) requiring Avanquest to fully disclose the true

24   nature of its software products in the future;

25         E.      Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys'

26   fees;

27

28

FIRST AMENDED COMPLAINT                    25                    CASE NO. 3:12-cv-04391-SI

1        F.      Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent

2   allowable;

3        G.      Entering such other injunctive and/or declaratory relief as is necessary to protect the

4   interests of Plaintiffs and the Class; and

5        H.      Awarding such other and further relief as the Court deems reasonable and just.

6                                **DEMAND FOR JURY TRIAL**

7        Plaintiffs demand a trial by jury for all issues so triable.

8                             Respectfully submitted,

9                             **BENSON WORLEY and JOHNNY BOYD,**
                             individually and on behalf of all others similarly

10                         situated,

11   Dated: February 22, 2013         By:  /s/ Benjamin H. Richman

                                One of Plaintiffs' Attorneys

12

13                         JAY EDELSON (Admitted *Pro Hac Vice*)
                         jedelson@edelson.com

14                         RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
                         rbalabanian@edelson.com

15                         BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
                         brichman@edelson.com

16                         CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
                         cgivens@edelson.com

17                         EDELSON MCGUIRE, LLC
                         350 North LaSalle, Suite 1300

18                         Chicago, Illinois 60654
                         Telephone: (312) 589-6370

19                         Facsimile: (312) 589-6378

20                         SEAN P. REIS (SBN 184044)
                         sreis@edelson.com

21                         EDELSON MCGUIRE, LLP
                         30021 Tomas Street, Suite 300

22                         Rancho Santa Margarita, California 92688
                         Telephone: (949) 459-2124

23                         Facsimile: (949) 459-2123

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

    I, Benjamin H. Richman, an attorney, hereby certify that on February 22, 2013, I served the
3  above and foregoing ***Plaintiffs' First Amended Class Action Complaint***, by causing true and
accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's
4  CM/ECF electronic filing system, on this 22nd day of February, 2013.

5                                                      /s/ Benjamin H. Richman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| QUINCEY ROBINSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>AVANQUEST NORTH AMERICA INC., a California corporation, and AVANQUEST SOFTWARE S.A., a French company,<br><br>*Defendants.* | Case No.  **14CH14861**<br><br> |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Quincey Robinson brings this Class Action Complaint and Demand for Jury Trial against Defendants Avanquest North America Inc. and Avanquest Software S.A. (collectively referred to in the singular as "Avanquest") seeking relief for injuries they caused to him and a putative class of individuals through their deceptive design, marketing, and sale of their Fix-It Utilities Professional software ("Fix-It Utilities"). Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.      Defendant Avanquest Software S.A., through its subsidiary Avanquest North America Inc., develops software that it claims will increase the speed, performance, and stability of a personal computer ("PC"), protect against privacy risks, remove harmful errors, and improve Internet speeds. Unfortunately, as described more fully below, Avanquest deceptively markets Fix-It Utilities, which ultimately fails to deliver the level of utility advertised.

2.      Fix-It Utilities is available for purchase on Avanquest's websites, through third-

party resellers, and in packaged form at brick-and-mortar stores such as Best Buy and Office Depot. Marketing materials on Avanquest's websites, as well as on the software's physical packaging, say that Fix-It Utilities detects and repairs a wide range of PC errors, privacy threats, viruses, and other computer problems. Avanquest also promises that Fix-It Utilities will increase system startup speeds, prevent crashes and freezes, optimize a PC's performance, and remove security risks.

3.    Contrary to these marketing materials (and reports generated by the software's computer scan), Fix-It Utilities isn't actually capable of *performing a credible diagnostic test* of a PC and cannot actually remove damaging PC errors, appreciably improve a computer's boot time, nor prevent the common causes of system freezes as promised. In reality, Avanquest intentionally designed Fix-It Utilities to invariably report that harmful errors and threats exist on a computer, regardless of its actual condition.

4.    Avanquest holds itself out as a reputable leader in the "utility software" industry—*i.e.*, software that enhances and or repairs a PC's functionality. Because average consumers lack the requisite technical expertise to understand the underlying operations of Avanquest's software, they trust the company to convey truthful information about its products, and for its technology to honestly and accurately identify and remove harmful errors from their PCs. Avanquest betrayed that trust, and as a result, thousands of consumers have been, and continue to be, tricked into buying its software.

## PARTIES

5.    Plaintiff Quincey Robinson is a natural person and resident of the State of Illinois.

6.    Defendant Avanquest North America Inc. is a corporation existing under the laws of the State of California, with its headquarters and principal place of business located at 23801

Calabasas Road, Suite 2005, Calabasas, California 91302. Defendant Avanquest North America

Inc. is a subsidiary of Defendant Avanquest Software S.A. Defendant Avanquest North America

Inc. conducts business throughout this County, the State of Illinois, and the United States.

7.      Defendant Avanquest Software S.A. is a French company with its headquarters

and principal place of business located at 91 Boulevard National, Immeuble Vision La Defense,

92250 La Garenne Colombes, France. Defendant Avanquest Software S.A. conducts business

throughout this County, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-

209(a) because Defendants conduct business transactions in Illinois and have committed tortious

acts that took place in Illinois. Additionally, this Court has personal jurisdiction over Plaintiff

Robinson because he is a resident of Illinois.

9.      Venue is proper in Cook County because Defendants conduct business

transactions in Cook County, Plaintiff Robinson resides in Cook County, and the causes of action

arose, in substantial part, in Cook County. Specifically, Plaintiff Robinson purchased Fix-It

Utilities in Cook County.

## FACTUAL BACKGROUND

**I.      A Brief Overview of Avanquest.**

10.     Defendant Avanquest Software S.A. is a multi-national company that boasts being

"one of the top 10 consumer software publishers in the world".[1] According to Avanquest, the

company's mission is to design software to "provide a more secure and enjoyable experience to

---

[1]     Avanquest's Corporate Profile, http://www.avanquest.com/USA/discover-avanquest/
(last visited Sept. 9, 2014).

people looking for easy and affordable software solutions in everyday life."[2]

11.    Avanquest Software S.A. sells its software products—including Fix-It Utilities—

to consumers in the United States through its subsidiary, Avanquest North America Inc. Fix-It

Utilities is Avanquest's "No. 1 Selling Disk Utility Software", which it claims is a

"comprehensive tool to fix PC problems".

## II.    Avanquest Tricks Consumers Into Purchasing Fix-It Utilities by Uniformly Misrepresenting its Functional Capabilities.

12.    A consumer searching the World Wide Web for software to repair a damaged

computer, protect against privacy threats, or generally increase the speed or performance of a PC

will likely encounter advertisements for Fix-It Utilities. Clicking on one of Avanquest's

advertisements directs the user to its website, www.avanquest.com, where Avanquest makes

numerous representations regarding the software's utility.

13.    For example, a visitor to Avanquest's website is presented with the following

descriptions of Fix-It Utilities' functional capabilities: [3]

- "One-Click runs comprehensive diagnostic tests, fixes PC problems in a flash and leaves your computer running like new";

- "With Fix-It's One-Click wizards and Active Intelligence Technology, you can fix everything easily and automatically . . . .";

- "Fixes your PC Today and Prevents Problems Tomorrow!";

- "Total Virus & Spyware Protection";

- "400% faster windows registry repair";

---

[2]    Avanquest's Mission and Values, http://www.avanquest.com/USA/group/company/ (last visited Sept. 9, 2014).

[3]    Avanquest's Fix-It Utilities 15 Professional, http://www.avanquest.com/USA/software/www.avanquest.com/USA/software/fix-it-utilities15-professional-501513 (last visited Aug. 31, 2014).

- "Stop PC Crashes & Freezes"; and

- "Repair System & Hard Drive Errors".

14.    Likewise, Fix-It Utilities' retail packaging lists the following representations about the software's functionality:

- "Fix, Speed Up and Maintain Your PC";

- "Keep[] your PC running like new";

- "Intelligently identif[y] system slowdowns";

- "Fix[] problems and speed[] up Windows";

- "Diagnose[] & update[] device drivers"; and

- "Stop[] PC crashes and freezes".

15.    But these representations do not accurately reflect Fix-It Utilities' true capabilities. The truth is that, irrespective of its "anti-virus" feature,[4] Fix-It Utilities primarily performs only two main functions: it is a registry cleaner[5] and it removes superfluous "temporary" files from a hard drive. These operations do not come close to squaring with Avanquest's representations about the software's functionality. For instance, as discussed more fully below, neither of these tasks remove damaging PC errors, appreciably improve a computer's boot time, or prevent the common causes of system freezes.

16.    Because of the impression created by Avanquest's affirmations of fact about the software's utility, consumers rightfully believe that Fix-It Utilities will detect the errors and

---

[4]    Avanquest also claims that Fix-It Utilities provides "Total Virus & Spyware Protection", but because this feature isn't installed on every user's computer, it is not central to this lawsuit.

[5]    "Registry cleaner" software is a type of utility program designed to remove unwanted or redundant items from the Microsoft Windows operating system registry. The "registry" is a database of configuration settings that help facilitate the operation of computer applications in the operating system.

problems identified above. To validate this belief, Avanquest designed Fix-It Utilities to appear

as though it's performing actual analyses of the health and security of a consumer's PC.

Unfortunately for purchasers of the software, and as discussed more fully below, that's not

actually the case.

**III.    Fix-It Utilities Was Designed to Invariably Report that a Computer Needs Repair Without Conducting a Credible Evaluation of its Condition.**

17.     Upon purchasing, installing, and running Fix-It Utilities for the first time, a screen

is displayed indicating to the user that the computer "is not optimized." *See* <u>Figure 1</u> below

(showing a screenshot of Fix-It Utilities' initial graphical user interface).



(<u>**Fig. 1.**</u>)

18.     After warning that the computer isn't optimized, Fix-It Utilities advises

conducting a diagnostic scan by clicking the "Analyze Now" button. <u>Figure 2</u> on the following

page shows a screenshot of Fix-It Utilities' scanning process purportedly assessing a computer's

condition.

**Scan Progress**
This may take some time. Please wait...

**SCANNING FOR PROBLEMS - Registry Fixer**
Progress: 1%
Initializing registry scan...

**OVERALL PROGRESS**
Progress: 32%

Stop

(**Fig. 2.**)

19.     After the scan is complete, Fix-It Utilities displays an ominous graphical

depiction of an alert sign showing that a number of serious "problems" have been detected on the

computer, all of which require fixing. *See* <u>Figure 3</u> below (showing a screenshot of Fix-It

Utilities' error reporting interface). In addition to this warning, Fix-It Utilities displays a graphic

of three cylinders labeled "Optimization", "Security", and "Maintenance", with color spectrums

ranging from red to green, along with corresponding percentages supposedly representing the

computer's condition based on the results of the software's diagnostics scan. *See id.*



(**Fig. 3.**)

20.     Clicking on the "Problems" section of Fix-It Utilities' navigation bar displays a

warning that "[x amount of] problem(s) are affecting [their] PC's health and security"

accompanied by an itemized list of problems that it claims are harming the computer. *See* Figure

4 below.



(**Fig. 4.**)

21.     While the software's graphics and text appear alarming to the user, the truth is

that Avanquest designed Fix-It Utilities to report that a computer is in poor condition *without any*

*real evaluation.* In this way, the user believes that Fix-It Utilities is actually detecting and

reporting harmful errors—errors that presumably cause the problems that Avanquest represents

that the software will fix.

**IV.     Fix-It Utilities Was Designed to Invariably Report Benign Errors as Harmful.**

22.     On the surface it appears that Fix-It Utilities actually detects, reports, and repairs

errors that threaten the operations of a PC. In reality, Avanquest intentionally designed the

software to vastly overstate both the amount and severity of errors that it purportedly fixes in an

effort to persuade users that it functions as advertised—*i.e.*, that it actually detects and removes credible threats and PC problems.

23. A closer look at the technology used in Fix-It Utilities' scanning engine reveals that the software always reports that a PC is in poor condition—regardless of its actual status or variances in the type of computer the software is running on—and misleadingly characterizes harmless files as severe "problems". Similarly, the software artificially inflates the number of issues detected, which causes Fix-It Utilities to invariably report that the computer is threatened by "problems" that require fixing.

24. By way of illustration, each of the screenshots above (showing Fix-It Utilities detecting a number of issues and reporting them as "problems") result from scans conducted on a *brand new computer*. It logically follows from this finding that according to Fix-It Utilities' reporting algorithm, even brand new computers are threatened by "problems" requiring repair.

25. Not only is Fix-It Utilities designed to artificially inflate the number of problems reported, the issues detected do not actually negatively impact a computer's operation. For instance, in Figure 3 above, Fix-It Utilities reported the computer's "Optimization" and "Maintenance" levels as poor. However, an inspection of the individual "problems" reported by Fix-It Utilities as causing the computer's "Optimization" and "Maintenance" levels to be poor shows that in actuality and as explained below, certain of these items are actually harmless registry keys and data files.

26. Contrary to Fix-It Utilities' report, empty or not commonly used registry keys are benign items that don't, *ipso facto*, impede or adversely affect the normal operations of a computer. Accordingly, Fix-It Utilities' claim that these items are "problems" affecting the computer's condition is merely a tactic used to drive up the total number of problems reported to

the user.

27.    Fix-It Utilities also identifies and reports common files—called cookies[6]—as "threats" that require removal. This claim is also unsubstantiated. Microsoft, one of the largest developers of computer software and the creator of the Windows operating system, maintains a "Safety & Security Center" website that provides educational materials about PC security best practices. On its website Microsoft states that "[w]hile it is possible to misuse a cookie in cases where there is personal data in it, *cookies by themselves are not malicious.*"[7]

28.    Cookies are ubiquitous on the web and are used by most popular websites. To illustrate the point, even Avanquest itself uses cookies. When a consumer visits one of its websites, Avanquest attempts to place a cookie onto the visitor's computer. Avanquest relies on cookies to, among other things, track information about visitors to its websites, such as which products they have added to their "shopping carts".[8] Avanquest even recognizes on its website that cookies aren't inherently bad.[9]

29.    This makes it all the more concerning that Avanquest designed Fix-It Utilities to detect its own cookies and report them as "threats" to a computer's security. For instance, Figure 5 on the following page shows Fix-It Utilities warning about the detection of a threat that has been quarantined.

---

[6]    "Cookies" are small computer files that are generated by websites and stored on the website visitor's computer. Websites use cookies to store useful information, such as usernames and preferences, to make interaction with the sites easier and more efficient.

[7]    Microsoft Safety & Security Center: What is a cookie?, http://www.microsoft.com/security/resources/cookie-whatis.aspx (last visited Aug. 29, 2014).

[8]    Avanquest: Shop With Confidence > Guaranteed Security, http://www.avanquest.com/USA/aq-you/shop-with-confidence/ (last visited Aug. 29, 2014).

[9]    *See id.*



**(Fig. 5.)**

30.     Further review of the purported "threat" shows that it's nothing more than an ordinary cookie. Moreover, the cookie that was detected and reported as a "threat" was generated by visiting *Avanquest's own website*. From this finding, it's apparent that rather than program Fix-It Utilities to legitimately evaluate the security risk posed by individual cookies, Avanquest engineered the software to classify commonplace cookies as "threats".

31.     The reason that identifying the above mentioned files as problems or threats is misleading is because Fix-It Utilities will virtually *always* report that certain files—files not actually detrimental to a PC's performance—are impacting the computer's condition. Compounding the problem is that these files occur and recur naturally with normal computer usage; therefore it is nearly certain that Fix-It Utilities will continue to find them as the software is used.

32.     Through the deceptive scheme described herein, Avanquest has profited, and continues to profit, by misleading consumers into believing that their PCs are damaged and/or at risk, and that the purchase and continued use of its Fix-It Utilities software is necessary to "fix"

these problems. But, because the software does not actually provide the benefits advertised, Avanquest does not deliver on its promises to users

## V.     Avanquest Continues its Deceptive Practices in Disregard of the Changing Utility Software Industry.

33.     Unfortunately for consumers, Avanquest is not alone in its use of the sorts of deceptive programmatic design and marketing practices at issue in this case. Rather, the utility software industry has been fraught with these tactics for over a decade. It is only recently, however, that software developers—like Avanquest and its competitors—have been called to account for profiting off of unsuspecting consumers.

34.     Indeed, numerous lawsuits have been filed against well-known competitors of Avanquest (*e.g.*, Symantec Corp. and AVG Technologies)—including several by Plaintiff's counsel here—which allege similar claims related to the deceptive design and marketing of utility software products. Several of those cases have resulted in classwide settlements and industry-changing modifications to the software products at issue—making their detection, reporting and repairing mechanisms far more transparent and more accurate when it comes to informing consumers of the threats posed by existing errors on their computers. Still others are being actively litigated. Rather than make the necessary changes to its software so that it *actually* detects, reports and repairs harmful problems and threats on users' PCs, Avanquest has continued its unlawful business practices and profits from them to this day.

## VI.     Plaintiff Robinson's Experience.

35.     In late 2013, Plaintiff Robinson visited his local office supply store to search for software that would increase the speed, performance, and stability of his PC, protect against privacy risks, remove harmful errors, and improve his Internet speeds. At the store, Plaintiff discovered Avanquest's Fix-It Utilities 14 Professional and read Avanquest's representations

about the software's utility located on its box and packaging materials, such as those described in

Paragraph 14 above and as depicted in Figure 6 below (showing a screenshot of Avanquest's

Fix-It Utilities product packaging).



(**Fig. 6.**)

36.     Relying upon the packaging's representations—including its assertion that the

product will "Fix, Speed Up and Maintain [his] PC", "Keep[ his] PC running like new",

Intelligently Identif[y] system slowdowns", "Fix[] problems and speed[] up Windows", and

"Stop[] PC crashes and freezes"—Robinson purchased Avanquest's Fix-It Utilities 14

Professional for approximately $39.95.

37.     The Fix-It Utilities software that Robinson purchased did not—and could not—

perform as advertised by Avanquest. In reality, Avanquest designed the software to invariably

and arbitrarily report that problems and threats exist on a user's computer, as detailed in Section

IV above. As such, Plaintiff purchased the product under the falsely created belief that Fix-It

Utilities was capable of honestly and accurately assessing the condition of his computer and that

it was otherwise capable of detecting and removing harmful problems and threats as promised.

38.     But for Avanquest's descriptions about Fix-It Utilities' functional capabilities,

Plaintiff would not have purchased and continued to use the software.

## CLASS ALLEGATIONS

39.     **Class Definition**: Plaintiff Robinson brings this action pursuant to 735 ILCS 5/2-801 on behalf of himself and a class of similarly situated individuals, defined as follows:

> All residents of the State of Illinois who purchased Avanquest's Fix-It Utilities Professional software.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

40.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but on information and belief, Avanquest has sold its software to thousands of Class members throughout the State of Illinois, making joinder of each individual member impracticable. Ultimately, the Class members will be easily identified through Avanquest's records.

41.     **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members:

    a)     whether Avanquest intentionally designed Fix-It Utilities to invariably report that harmful problems and threats exist on a user's computer, regardless of the computer's actual condition;

    b)     whether Avanquest intentionally misrepresented the functionality of Fix-It

Utilities;

c) whether Avanquest's conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

d) whether Avanquest's conduct described herein constitutes fraudulent inducement;

e) whether Avanquest's conduct described herein constitutes a breach of contract; and

f) whether Avanquest has been unjustly enriched as a result of its conduct described herein.

42.      **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Avanquest has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

43.      **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Avanquest's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class

to obtain effective relief from Avanquest's misconduct. Even if members of the Class could

sustain such individual litigation, it would not be preferable to a class action because individual

litigation would increase the delay and expense to all parties due to the complex legal and factual

controversies presented in this Complaint. By contrast, a class action presents far fewer

management difficulties and provides the benefits of single adjudication, economies of scale, and

comprehensive supervision by a single court. Economies of time, effort, and expense will be

fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act**
**815 ILCS 505/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

44.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

45.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1, *et seq.* (the "Consumer Fraud Act"), protects both consumers and companies by

promoting fair competition in commercial markets for goods and services.

46.     The Consumer Fraud Act prohibits any unlawful, unfair or fraudulent business

acts or practices, including the employment of any deception, fraud, false pretense, false

promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

47.     As described herein, Avanquest has engaged in deceptive and fraudulent business

practices, as defined by the Consumer Fraud Act, by, *inter alia*: (i) misrepresenting Fix-It

Utilities' functional capabilities as described in Section II, including Avanquest's descriptions in

Paragraphs 13–14 and depicted in Figure 6; (ii) misrepresenting the results of the diagnostic

scans (*i.e.*, the overall condition of users' computers) through in-software representations; (iii)

using the misrepresentations to induce consumers into continuing to use the software; and (iv)

selling software that lacks the advertised utility, produced false error reports, and was otherwise

incapable of functioning as Avanquest represented it would.

48.     Specifically, Avanquest affirmatively represented to Plaintiff and the Class that Fix-It Utilities would honestly and accurately scan their PCs for harmful problems, increase their PCs' speed and stability, increase the speed of their Internet connection, and protect their PCs from harmful programs.

49.     The above affirmative representations, as well as the results of the "diagnostic scan" provided by the software were, in fact, false. Fix-It Utilities did not—and could not— perform an actual evaluation of Plaintiff's and the Class's computers or any problems existing on them, and did not function as Avanquest described.

50.     Avanquest has violated the "unfair" prong of the Consumer Fraud Act in that it caused substantial injury to consumers through its actions identified above. The injury caused by Avanquest's conduct is not outweighed by any countervailing benefits to consumers, and the injury is one that consumers themselves could not have reasonably avoided. Given the information asymmetry between Avanquest and consumers regarding Fix-It Utilities' functionality, Avanquest knew or had reason to know that Plaintiff and the Class could not reasonably have known of or discovered the falsity of Avanquest's representations or avoided the harm those misrepresentations caused.

51.     Avanquest has also violated the "fraudulent" prong of the Consumer Fraud Act in that its statements, advertisements, and representations regarding the utility and functionality of Fix-It Utilities—substantially similar to those depicted in Figure 6 and otherwise described in Paragraph 13–14—and the results of the software's scans are false and likely to deceive a reasonable consumer, as described in Section IV.

52.     Avanquest's fraudulent, unfair, and unlawful conduct directly and proximately

caused Plaintiff and the Class actual monetary damages in the form of the price paid for the Fix-It Utilities software—typically $39.95.

53.     Accordingly, Plaintiff seeks an order: (i) permanently enjoining Avanquest from continuing to engage in fraudulent, unfair, and unlawful conduct; (ii) requiring Avanquest to pay actual and compensatory damages; and (iii) requiring Avanquest to pay interest, attorneys' fees, and costs.

### SECOND CAUSE OF ACTION
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

54.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

55.     As described in particularity in <u>Section II</u> above, and as described throughout this Complaint, Avanquest has used, and continues to use, marketing tactics it knows or reasonably should know are false and misleading.

56.     To induce Plaintiff and the Class into purchasing and/or continuing to use Fix-It Utilities, Avanquest affirmatively represented that Fix-It Utilities provided a certain level of utility. Specifically, Avanquest represented that Fix-It Utilities would honestly and accurately scan consumers' PC's for harmful problems, increase a PC's speed and stability, improve the speed of their Internet connections, protect their computers from security threats, and otherwise perform the beneficial tasks depicted in <u>Figure 6</u> and described in <u>Section II</u>.

57.     Avanquest's affirmative representations were, in fact, false. In particular, Fix-It Utilities does not—and cannot—increase a computer's performance and stability in the manner Avanquest described.

58.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue to use a product. Any deception or fraud related to the utility of a product is materially

misleading.

59.     As Fix-It Utilities' developer, Avanquest knew that its representations about Fix-It Utilities' functional capability were false. Avanquest intentionally designed its public representations to mislead consumers about Fix-It Utilities' functional capabilities and programmed the software to falsely report that problems exist on a user's computer and to deceive users about their PC's true conditions.

60.     Avanquest made these misrepresentations with the intent to induce Plaintiff and the Class to rely upon them by purchasing and/or continuing to use Fix-It Utilities.

61.     As consumers lacking the requisite technical expertise to independently gauge Fix-It Utilities' underlying functionality, and taking Avanquest's statements at face value, Plaintiff and the Class justifiably relied upon Avanquest's misrepresentations by purchasing and continuing to use Fix-It Utilities. They would not have purchased, nor continued to use, Fix-It Utilities but for the misrepresentations that their PCs were in need of repair and that Fix-It Utilities was capable of making such repairs.

62.     As a result of their reasonable reliance on Avanquest's misrepresentations, Plaintiff and the Class have been damaged in the amount of Fix-It Utilities' purchase price (typically $39.95), or at least a portion thereof.

63.     Plaintiff therefore prays for relief in the amount of the difference between the purchase price he and the Class paid for Fix-It Utilities and its actual value. Plaintiff further alleges that Avanquest's conduct and misrepresentations were made with malice and in conscious disregard of Plaintiff's and the Class's rights, thereby entitling them to punitive damages against Avanquest in an amount sufficient to deter such conduct in the future.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

64.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.     Plaintiff and the Class members entered into agreements with Avanquest whereby Avanquest agreed to sell, and Plaintiff and the Class agreed to purchase, software that would detect and remove legitimate computer problems from Plaintiff's and the Class's computers, and perform the beneficial tasks described in Section II and depicted in Figure 6.

66.     Based on the foregoing offer, Plaintiff and the Class agreed to purchase Avanquest's Fix-It Utilities software. Plaintiff and the Class paid, and Avanquest accepted, Fix-It Utilities' purchase price (approximately $39.95 in Plaintiff's case), and therefore performed their obligations under the contracts.

67.     Avanquest breached its contracts with Plaintiff and the Class by intentionally designing the software to mischaracterize the true condition of computers and further by failing to provide software that performed the tasks described in Section II and depicted in Figure 6. These obligations were material terms of the agreement.

68.     Further, Illinois contract law recognizes the implied covenant of good faith and fair dealing in every contract. Thus, implicit in its contracts with Plaintiff and the Class were provisions prohibiting Avanquest from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the agreement.

69.     Avanquest acted in bad faith and breached these provisions of the agreement, specifically by not honoring its responsibilities to perform truthful diagnostic and remedial operations, as described herein, and instead, providing software that it intentionally designed to produce false error reports, misrepresent the actual status of users' PCs, and was incapable of removing purported problems as advertised.

70.     Furthermore, Avanquest was under an implicit obligation to comply with 815 ILCS 505/1, *et seq.*, to be truthful in its advertisements, and to accurately disclose the functionality and utility of its software. Avanquest did not honor any of these obligations.

71.     Avanquest breached the implied covenant of good faith and fair dealing by failing to: (i) provide software that would perform the beneficial tasks described in Section II and depicted in Figure 6; (ii) honestly and accurately inform consumers about the true condition of their PCs; and (iii) fully comply with the proscriptions of applicable statutory law.

72.     The aforementioned breaches of contract have directly and proximately caused Plaintiff and the Class economic injury and other damages, including in the form of the purchase price, or at least a portion thereof, of the Fix-It Utilities software, because they purchased a product that does not perform as Avanquest represented, and therefore lacks the promised and paid-for utility.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
*In the alternative to Breach of Contract*
**(On behalf of Plaintiff and the Class)**

73.     Plaintiff incorporates the allegations in paragraphs 1-63 as if fully set forth herein.

74.     If the Court finds Plaintiff's and the Class's contracts with Avanquest invalid, non-existent, or otherwise unenforceable, Plaintiff and the members of the Class may be left without any adequate remedy at law.

75.     Plaintiff and the Class have conferred a benefit upon Avanquest in the form of the money Avanquest charged and collected from them for the purchase of the Fix-It Utilities software, which did not and could not perform as Avanquest promised.

76.     Avanquest appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

77.     Under principles of equity and good conscience, Avanquest should not be permitted to retain the monies belonging to Plaintiff and the Class that it unjustly received as a result of its wrongful conduct described herein.

78.     Accordingly, Plaintiff, on behalf of himself and the other members of the Class, seeks restitution and disgorgement of all amounts by which Avanquest has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Quincey Robinson, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Robinson as representative of the Class, and appointing his counsel as Class Counsel;

B.     Declaring that Avanquest's actions, as set out above, constitute (i) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, (ii) fraudulent inducement, (iii) breach of contract, and (iv) unjust enrichment (in the alternative to breach of contract);

C.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an order (i) prohibiting Avanquest from engaging in the wrongful and unlawful acts described herein, (ii) requiring Avanquest to disclose and admit the wrongful and unlawful acts described herein, and (iii) requiring Avanquest to fully disclose the true nature of its software products in the future;

D.     Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

     E.      Awarding restitution to Plaintiff and the Class in an amount to be determined at trial, and disgorging all amounts by which Avanquest has been unjustly enriched;

     F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

     G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

     H.      Entering such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

     I.      Awarding such other and further relief as equity and justice may require.

### JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**QUINCEY ROBINSON**, individually and on behalf of all others similarly situated,

Dated: September 15, 2014       By: _____

                               One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney E. Booth
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

EXHIBIT 3

1

2                              UNITED STATES DISTRICT COURT

3                            NORTHERN DISTRICT OF CALIFORNIA

4

5    JOHNNY BOYD, et al.,
                                                   Case No.  12-cv-04391-WHO
         Plaintiffs,
6

7        v.                                        ORDER DENYING DEFENDANT'S
                                                   MOTIONS TO DISMISS AND TO
     AVANQUEST NORTH AMERICA INC,                  ENFORCE VOLUNTARY DISMISSAL,
8                                                  AND GRANTING PLAINTFFS LEAVE
         Defendant.                                TO AMEND
9
                                                   Re: Dkt. Nos. 144, 151
10

11

12          Johnny Boyd mistakenly thought that he had purchased defective Fix-it Utilities

13   Professional ("Fix-It") software instead of System Suite PC Tune-up & Repair ("System Suite")

14   when he joined a class action over one and one-half years ago against the designer of the software,

15   Avanquest North America Inc. ("Avanquest"). Boyd's co-class representative, Benson Worley,

16   had previously been pursuing claims related to System Suite.  On August 25, 2014, Worley

17   dismissed his claims with prejudice, and the Stipulation for Voluntary Dismissal states both that

18   the claims against System Suite are dismissed without prejudice and that they will no longer be at

19   issue in this action, leaving only Boyd's claims concerning Fix-It.  But a few days after the

20   dismissal, Boyd realized that he had bought System Suite, not Fix-It, and notified Avanquest that

21   he wanted to amend his complaint.[1]

22          The parties' voluntary dismissal of System Suite claims without prejudice does not prevent

23   Boyd from amending the First Amended Complaint ("FAC") to include claims involving System

24   Suite.  Under these unusual circumstances, where Boyd acted in good faith and discovered his

25   mistake shortly after the dismissal, where the issues Boyd seeks to litigate have been an integral

26   part of the case's development thus far, and where there will be no impact on the trial date, Boyd

27   ─────────────────────
     [1] Although plaintiffs have not filed a formal motion to amend the First Amended Complaint, I will
28   address their request to amend as set forth in the opposition to Avanquest's motion to dismiss, and
     the accompanying exhibits. *See* Oppo. at 1-13 (Dkt. No. 157); Richman Decl., Ex. 1-A (Dkt. No.
     157-1).

*United States District Court*
*Northern District of California*

1    has satisfied the requirements for leave to amend pursuant to Federal Rules of Civil Procedure 15

2    and 16.  For these reasons, I DENY Avanquest's motion to enforce the parties' voluntary

3    dismissal, and GRANT Boyd leave to amend the FAC as set forth in his opposition brief.  Because

4    the second amended complaint cures any jurisdictional deficiencies in this case, I also DENY

5    Avanquest's motion to dismiss for lack of subject matter jurisdiction.[2]

6                                                **BACKGROUND**

7            Worley filed this suit as the representative of a class of consumers who bought either Fix-It

8    or System Suite, substantially similar software programs designed by Avanquest to improve

9    computer function.  FAC ¶¶ 17-19 (Dkt. No. 52).  Worley contended that Avanquest fraudulently

10   induced consumers to buy these products, which erroneously diagnose computers with a host of

11   problems.  Compl. ¶¶ 1-8 (Dkt. No. 1); FAC ¶¶ 31-32.  Worley alleged violations of (i)

12   California's unfair competition law; (ii) fraudulent inducement; (iii) breach of express warranties;

13   (iv) breach of contract; and (v) breach of the implied covenant of good faith and fair dealing.

14   Compl. at 1.

15           On November 30, 2012, Avanquest filed a motion to dismiss Worley's complaint, which

16   Judge Illston granted in part and denied in part.  Dkt. No. 48.  The order noted that there were no

17   allegations regarding Fix-It and that Worley only alleged that he had purchased System Suite.  *Id.*

18   at 1.  Subsequently, the parties agreed to add Boyd as a named plaintiff in the action and the

19   plaintiffs filed the FAC.  Order Granting Stipulation (Dkt. No. 51).  The FAC alleged that Worley

20   had purchased System Suite and that Boyd had purchased Fix-It.  FAC ¶¶ 46, 54.  The court

21   denied another motion to dismiss the FAC and the parties proceeded to discovery.  Dkt. No. 66.

22   Once the case was transferred to me, I issued a pretrial scheduling order on October 1, 2013, and

23   set a deadline to file motions to join parties or amend pleadings for January 10, 2014.  Dkt. No.

24   110.

25           On August 25, 2014, the parties filed a joint stipulation for voluntary dismissal of Worley

26   as plaintiff and of all claims related to System Suite.  Dkt. No. 143.  But shortly afterwards, the

_____

[2] Pursuant to Local Rule 7–1(b), this matter is suitable for determination without oral argument
and I vacated the hearing scheduled for October 15, 2014.

                                                        2

*(left margin, vertical text)* United States District Court   Northern District of California

1   plaintiffs discovered that Boyd bought and installed System Suite, and not Fix-It, on his computer.

2   Richman Decl. ¶¶ 24-25 (Dkt. No. 157-1).  Avanquest asserts that this means there is no subject

3   matter jurisdiction and seeks to enforce the voluntary dismissal of claims relating to System Suite.

4   Dkt. Nos. 151-1, 144, 145.  It argues that Boyd does not have standing to assert claims relating to

5   System Suite, and that he cannot amend his complaint to include claims involving System Suite.

6   Dkt. Nos. 151-1, 144, 145.  In response, plaintiffs express their intention to substitute claims

7   relating to System Suite for those relating to Fix-It in the FAC, thus curing any jurisdictional

8   deficiency.  Richman Decl., Ex. 1-A.

9                                    **LEGAL STANDARD**

10          Once the district court has issued a scheduling order, a party seeking leave to amend its

11   pleadings must satisfy the requirements of Federal Rule of Civil Procedure 16 if amendment

12   would impact any of the deadlines set by the scheduling order.  *Johnson v. Mammoth Recreations,*

13   *Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  Rule 16 requires that the party requesting leave to

14   amend show "good cause" for its failure to amend by the time set in the scheduling order.  *Id.* at

15   608.  "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking

16   the amendment.  The district court may modify the pretrial schedule 'if it cannot reasonably be

17   met despite the diligence of the party seeking the extension.'"  *Id.* at 609 (internal citations and

18   quotations omitted).

19          If the party seeking leave to amend satisfies Rule 16, it must then satisfy Federal Rule of

20   Civil Procedure 15.  *Id.* at 608.  Under Rule 15, courts should grant leave to amend freely, "unless

21   amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates

22   undue delay."  *Id.* at 607.

23          Parties may voluntarily dismiss an action without a court order pursuant to Federal Rule of

24   Civil Procedure 41(a)(1)(A)(ii).  A voluntary dismissal "leaves the situation as if the action never

25   had been filed."  *City of South Pasadena v. Mineta*, 284 F.3d 1154, 1157 (9th Cir. 2002) (internal

26   citations and quotations omitted).

27

28

United States District Court
Northern District of California

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## DISCUSSION

### I.   MOTION TO ENFORCE THE VOLUNTARY DISMISSAL OF CLAIMS RELATED TO SYSTEM SUITE

Avanquest claims that the parties' stipulation for voluntary dismissal precludes this court from allowing Boyd to amend his complaint to include allegations relating to System Suite.[3] Dkt. No. 151-1 at 5-6.  The stipulation for voluntary dismissal of claims states that "Worley's individual claims against Avanquest in this action shall be dismissed *with prejudice*." Dkt. No. 143 at 1.  It further provides: "[t]he claims of the putative class related to Avanquest's System Suite software shall be dismissed *without prejudice*, that the System Suite software shall no longer be at issue in this action and all claims related to all versions of the System Suite software shall be dismissed from the above-captioned action." *Id.*  The stipulation does not specify whether the System Suite claims are dismissed with or without leave to amend.

Parties may voluntarily dismiss an action without a court order pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  Avanquest correctly asserts that voluntary dismissals pursuant to this rule are self-executing, and that once the action is dismissed the court may no longer exercise jurisdiction over it.  *See, e.g., Commercial Space Mgmt. Co. v. Boeing Co.*, 193 F.3d 1074, 1077-78 (9th Cir. 1999).  But these principles do not prevent Boyd from amending his present complaint.  Avanquest's argument to the contrary rests on inapposite cases that focus on the possibility of courts retaining jurisdiction over actions dismissed pursuant to Rule 41, such as to carry over a waiver of immunity or to alter the conditions of dismissal.  *See, e.g., Cadkin v. Loose*, 569 F.3d 1142, 1149-50 (9th Cir. 2009); *Commercial Space Mgmt. Co.*, 193 F.3d 1074, 1077-78.  These cases would be on point for Worley, not Boyd.

I am not exercising jurisdiction over the action and claims involving Worley and System Suite that were dismissed, but focusing on the remaining action involving Boyd and Fix-It.  Courts treat claims dismissed pursuant to Rule 41, such as those relating to System Suite, as though they

---

[3] In support of this motion, Avanquest also requests judicial notice of several documents filed in the docket for this case, which I grant.  *See* Dkt. Nos. 145, 147, 152.

4

1   were never filed. *Commercial Space Mgmt.*, 193 F.3d at 1077.

2       Avanquest argues that the parties' negotiations and waiver of fees reflect their intent that

3   the System Suite claims be dismissed without leave to amend. Reply Mot. to Enforce at 4-5 (Dkt.

4   No. 161). The parties did not include this language in the stipulated voluntary dismissal, and

5   plaintiffs dispute Avanquest's assertion. Because the claims involving System Suite were

6   dismissed without prejudice, Boyd is not precluded from re-filing claims relating to System Suite

7   or alternatively amending the claims in the current action to include System Suite.

8   **II. MOTION TO DISMISS**

9       In order to resolve Avanquest's motion to dismiss, I must first determine whether Boyd

10   may amend his complaint under Federal Rules of Civil Procedure 15 and 16. I issued a scheduling

11   order that set the deadline for amendment of the complaints for January 10, 2014. Dkt. No. 110.

12   Boyd's request to amend the FAC was made well after this time, on September 19, 2014. Oppo.

13   at 1 (Dkt. No. 157). Therefore, Boyd must satisfy Rule 15 as well as the good cause standard of

14   Rule 16. Under Rule 16, Boyd must show good cause for his failure to comply with the deadlines

15   set out in the 2013 scheduling order. *Johnson*, 975 F.2d at 609. Rule 16's requirements are

16   intended to prevent "meaningful case management issues" and to "facilitate judicial control over a

17   case." *C.F. v. Capistrano Unified School Dist.*, 656 F. Supp. 2d 1190, 1197 (C.D. Cal. 2009).

18   Although the focus of a Rule 16 analysis is upon the diligence of the party seeking to amend, "the

19   existence or degree of prejudice to the party opposing the modification might supply additional

20   reasons to deny a motion." *Johnson*, 975 F.2d at 609.

21       According to both parties, Boyd's untimely request for amendment results from his

22   mistaken belief that he had bought and installed Fix-It—and not System Suite—on his computer.

23   Richman Decl. ¶¶ 24-25; Reply Mot. Dismiss at 2 (Dkt. No. 160). Avanquest contends that the

24   plaintiffs' attorneys' repeated failure to inspect Boyd's computer amounts to a lack of diligence

25   that cannot satisfy the Rule 16 standard. Reply to Mot. Dismiss at 13-15. Although the plaintiffs

26   should have verified Boyd's claims regarding which software he installed, the programs may be

27   easily confused with one another. *See* FAC ¶¶ 18-19. Boyd moved to amend shortly after

28   learning of this mistake. The current pretrial schedule will not be greatly altered by granting

United States District Court
Northern District of California

5

1   Boyd's request.  The parties are in the midst of discovery, which has been stayed, and have yet to

2   take depositions.  *See* Order re: Disc. and Case Mgmt. at 1-2 (Dkt. No. 155).

3          Furthermore, there is little prejudice to Avanquest.  The claims involving System Suite

4   were part of this action until August, 25, 2014.  Magistrate Judge Beeler stayed discovery on

5   September 11, 2014, though Avanquest was aware of Boyd's intent to amend his pleadings as

6   early as September 5, 2014.  *See* Order re: Disc. and Case Mgmt. at 2; Strickland Decl., Ex. 4

7   (Dkt. No. 151-3 at 15).  At most, a little over two weeks passed during which Avanquest may have

8   declined to pursue discovery related to System Suite.[4]  Allowing Boyd to amend would not require

9   continuing the trial date.

10         Avanquest emphasizes the substantial time and money that it has dedicated to defending

11  the to-be-abandoned Fix-It claims.  *See* Reply Mot. to Enforce 4; Reply Mot. Dismiss 14-15.  That

12  is no doubt true, but those costs have already been incurred for a now abandoned claim.  They do

13  not constitute future prejudice for purposes of the analysis of whether to allow Boyd to amend his

14  complaint.  Dismissal, on the other hand, would require the parties to refile and redo the pleadings

15  and discovery in a new case on issues already developed here, causing delay in the administration

16  of justice and an unnecessarily inefficient and costly result.  *See* Fed. R. Civ. P. 1.

17         While this is a close case, given the unusual circumstance that the identical claims Boyd

18  seeks to litigate have been at issue throughout the litigation, as well as the fact that his mistake

19  was clearly inadvertent and there will be no impact on the trial date, Boyd may amend the FAC

20  pursuant to Rule 16 as well as under the more liberal standard for Rule 15.

21         I GRANT leave to amend the FAC as described in Exhibit 1-A filed with the plaintiffs'

22  opposition brief on September 19, 2014.  Because both parties agree that Boyd does not have Fix-

23  It installed on his computer, and that he never purchased that software, the claims relating to Fix-It

24  are dismissed and replaced with claims relating to System Suite.

25         Avanquest does not present any argument that Boyd would lack standing if allowed to

26

27  _____

[4] This case is unlike *Contreras v UAL Corp*, 2014 US Dist LEXIS 15953 (N.D.Cal. Feb. 7, 2014),
    on which Avanquest relies, since the harassment claim at issue there had been dismissed for more
28  than three years and substantial discovery had already occurred under the assumption that the
    claim was not in the case.

United States District Court
Northern District of California

1  amend the FAC.  In light of my ruling that Boyd may amend the FAC to include claims involving

2  System Suite, dismissal for lack of standing is not appropriate.  Therefore, Avanquest's motion to

3  dismiss for lack of subject matter jurisdiction is DENIED.

**CONCLUSION**

5      Defendant's motion to enforce the parties' stipulated voluntary dismissal is DENIED, as is

6  its motion to dismiss for lack of subject matter jurisdiction or alternatively for an OSC re:

7  dismissal.  Plaintiffs' opposition motion is treated as a motion for leave to amend, which is

8  GRANTED.  Plaintiffs are directed to file a second amended complaint substituting the claims

9  describing System Suite in place of the claims describing Fix-It in the FAC no later than 7 days

10  from the date of this order.

11      **IT IS SO ORDERED**.

12  Dated: October 14, 2014

14  WILLIAM H. ORRICK
United States District Judge

EXHIBIT 4

1  Jay Edelson (Admitted *Pro Hac Vice*)
   jedelson@edelson.com
2  Rafey S. Balabanian (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
3  Benjamin H. Richman (Admitted *Pro Hac Vice*)
   brichman@edelson.com
4  Chandler R. Givens (Admitted *Pro Hac Vice*)
   cgivens@edelson.com
5  EDELSON PC
   350 North LaSalle Street, Suite 1300
6  Chicago, Illinois 60654
   Tel: 312.589.6370
7  Fax: 312.589.6378

8  Mark Eisen (SBN – 289009)
   meisen@edelson.com
9  EDELSON PC
   555 West Fifth Street, 31st Floor
10 Los Angeles, California 90013
   Tel: 213.533.4100
11 Fax: 213.947.4251

12 *Attorneys for Plaintiff and the Putative Class*

13            **IN THE UNITED STATES DISTRICT COURT**

14           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                   **SAN FRANCISCO DIVISION**

16

| | |
|---|---|
| JOHNNY BOYD, individually and on behalf of all others similarly situated, | Case No. 3:12-cv-04391-SI |
| *Plaintiff,* | **SECOND AMENDED CLASS ACTION COMPLAINT FOR:** |
| *v.* | 1. **Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;** |
| AVANQUEST NORTH AMERICA INC., a California corporation, | 2. **Fraudulent Inducement;** |
| *Defendant.* | 3. **Breach of Contract; and** |
| | 4. **Breach of the Implied Covenant of Good Faith and Fair Dealing.** |
| | Judge: Honorable William H. Orrick |
| | Action Filed: August 21, 2012 |

1    Plaintiff Johnny Boyd ("Boyd" or "Plaintiff") brings this Second Amended Class Action

2   Complaint ("Complaint") against Defendant Avanquest North America Inc. ("Avanquest" or

3   "Defendant") for its practice of defrauding consumers through the deceptive design and sale of its

4   software products. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to

5   himself and his own acts and experiences and, as to all other matters, upon information and belief,

6   including investigation conducted by his attorneys.

7                              **NATURE OF THE ACTION**

8            1.     Avanquest is a multi-national developer of software products that it claims will

9   increase the speed, performance, and stability of a consumer's personal computer ("PC"), protect

10  against privacy risks, remove harmful errors, and improve Internet speeds. Unfortunately for

11  consumers, however, Avanquest's methods of inducing consumers to purchase and continue to use

12  its software, as well as the products' programmatic design, are highly deceptive.

13           2.     Through a common deceptive scheme, Avanquest uniformly defrauds consumers

14  into purchasing and continuing to use the product at issue in this lawsuit—SystemSuite PC Tune-

15  Up & Repair ("System Suite") (together with Fix-It Utilities Professional ("Fix-It Utilities"), the

16  "Scareware").

17           3.     The Scareware is available for purchase online through Avanquest's websites, third-

18  party resellers, and in packaged form at brick-and-mortar stores such as Best Buy and Office Depot.

19  Through the marketing materials contained on its websites, as well as the software's packaging

20  itself, Avanquest represents that the Scareware will detect and repair a wide range of PC errors,

21  privacy threats, viruses, and other computer problems. Avanquest also promises that the Scareware

22  will increase system startup speeds, optimize a user's PC performance, and remove security risks.

23           4.     In reality, Avanquest's descriptions of the Scareware's utility serve as the initial

24  phase of a fraudulent scheme to induce consumers into purchasing its products, and then to

25  convince them into paying ongoing subscription fees to continue using the software.

26           5.     Although its software is technologically complex, the paradigm used by Avanquest

27

28

1   to defraud consumers is simple. First, Avanquest describes its Scareware as software that will

2   restore a PC's functionality by removing harmful errors and privacy threats and increasing Internet

3   speeds. Induced by these representations, the consumer then purchases the Scareware. After

4   installing and running the Scareware, the consumer is encouraged to conduct a "diagnostic scan" to

5   assess the condition of his or her PC.

6         6.     The Scareware then invariably reports, in ominous fashion, that harmful problems

7   are lowering the PC's condition. Thereafter, the user is offered the ability to "fix" the PC by

8   removing the errors reported by the Scareware. However, as explained more fully herein, the

9   Scareware's diagnostics procedures do not perform any credible evaluation of consumers' PCs.

10   Instead, Avanquest intentionally designed the Scareware to invariably report that a user's PC needs

11   repair and is afflicted with harmful errors, privacy risks, and other problems—regardless of the

12   computer's actual condition. The average consumer logically assumes that errors detected through

13   this "diagnostic scan" correspond to the harmful problems identified by Avanquest's marketing

14   materials.

15         7.     The process described above is repeated each time a user runs the Scareware. Also of

16   significance is that the Scareware is offered on a yearly subscription basis. As such, the average

17   consumer (unaware of its deceptive nature) is convinced that the Scareware is detecting, reporting,

18   and repairing actual errors harming their PC's performance. Thus, because the Scareware was

19   designed to invariably "detect" harmful errors, the consumer is fraudulently induced into continuing

20   to renew his or her subscription (or not to seek a refund).

21         8.     Avanquest holds itself out as a reputable leader in the "utility software" industry—

22   i.e., software that enhances and/or repairs a PC's functionality. Because average consumers lack the

23   requisite technical expertise to understand the underlying operations of Avanquest's software, they

24   trust the company to convey truthful information about its products, and for its products to honestly

25   and accurately identify and remove harmful errors from their PCs. Avanquest betrayed that trust,

26   and as a result, thousands of consumers have been, and continue to be, tricked into paying for its

27

28

1    unlawful Scareware.

2                                    **PARTIES**

3           9.       Plaintiff Johnny Boyd is a natural person and citizen of the State of Georgia.

4           10.      Defendant Avanquest North America Inc. is a corporation incorporated in and

5    existing under the laws of the State of California, with its headquarters and principal place of

6    business located at 7031 Koll Center Parkway, Suite 150, Pleasanton, California 94566. Avanquest

7    conducts business throughout the State of California and the United States.

8                          **JURISDICTION AND VENUE**

9           11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

10   because (a) at least one Class member is a citizen of a different state than Defendant, (b) the amount

11   in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions

12   under that subsection apply to this action.

13          12.      This Court has personal jurisdiction over Avanquest because it conducts business in

14   California and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or

15   emanated from California.

16          13.      More specifically, Avanquest's relevant operations, including its headquarters and

17   primary sales and marketing operations are located in California. Vital employees, such as

18   Avanquest's Director of Online Marketing, Vice President of Strategic Sales and Marketing,

19   Director of Business Development, and Vice President of eCommerce and Direct Marketing are all

20   located in California. Thus, Avanquest's decisions regarding the programmatic design of the

21   software, as well as the representations made about the Scareware's utility, emanated from

22   California.

23          14.      Venue is proper in this District because the improper conduct alleged in this

24   Complaint occurred in, was directed to, and/or emanated from this District.

25

26

27

28

**INTRADISTRICT ASSIGNMENT**

15.     Pursuant to Civil Local Rule 3-2(d), this case has been assigned to the San Francisco Division.

**FACTUAL BACKGROUND**

**I.     A Brief Overview of Avanquest.**

16.     Founded in 1984 as French company BVRP Software, Avanquest[1] has today become a global leader in the PC utility software industry. Avanquest boasts that it is one of the "ten leading consumer software developers" in the world,[2] and asserts that its mission is to design software to "provide a more secure and enjoyable experience to people looking for easy and affordable software solutions in everyday life."[3]

17.     According to Avanquest, Fix-It Utilities and System Suite are its "#1 selling disk utility" and "Anti-virus/Anti-spyware" products. Avanquest claims that these software products offer a "complete package" that "make it easy to diagnose and fix your computer."

**II.     SystemSuite PC Tune-Up & Repair and Fix-It Utilities Professional are Substantially the Same Product.**

18.     While different in name, each Scareware product is substantially similar in functionality and design; so much so that Avanquest's marketing describes both Fix-it Utilities and System Suite as providing the same features and even created a single instruction manual for the two. *See* Figures 1-2 on the following page (showing screenshots of an Avanquest advertisement marketing the two products as having the same functionality, and the 'User Guide' included with purchase of the products).

---

[1]      In 1996, Defendant formed BVRP USA, which was later renamed Avanquest North America Inc.

[2]      Corporate Profile, http://www.avanquest.com/USA/corporate/company/history.html (last visited February 22, 2013).

[3]      Mission and Values, http://www.avanquest.com/USA/corporate/company/mission_and_values.html (last visited February 22, 2013).

1

2

3

4

5

6

(Figure 1.)

7

8

9

10

11



12

13

14

15

(Figure 2.)

16      19.      Additionally, a side-by-side comparison of the user interfaces from Fix-It Utilities

17  and SystemSuite confirms that—aside from product name—the two appear virtually identical. *See*

18  Figure 3 (showing screenshots of Fix-It Utilities' and SystemSuite's initial graphical user

19  interfaces).

20

21

22

23      

24

25

26

27      (Figure 3.)

28

---

SECOND AMENDED COMPLAINT                    6                    CASE NO. 3:12-cv-04391-WHO

**III.    Avanquest Tricks Consumers into Purchasing its Scareware Through a Common Deceptive Scheme.**

20.    A consumer searching the World Wide Web for software to repair a damaged computer, protect against privacy threats, or generally increase the speed or performance of a PC will likely encounter advertisements for Avanquest's Scareware. Clicking on the advertisement re-directs the individual to Avanquest's website, which contains representations about the Scareware's utility.

21.    For example, a consumer viewing Avanquest's website is presented with the following descriptions about the Scareware's functional capabilities:

- "Fix, Speed Up & Maintain Your PC";
- "One-Step PC Tool Wizards Make It Easy To Diagnose & Fix Your Computer";
- "40+ PC Tune Up Tools Scan, Identify & Fix PC Problems"; and
- "One-Click uncovers problems, helps you fix them & returns your PC to peak performance."

22.    These same representations are also found on the Scareware's physical packaging. In particular, the above assertions are strategically located on both sides of the products' boxes, such that consumers contemplating purchase can first read about their purported functionalities.

23.    Through these marketing materials, Avanquest also presents the consumer with representations designed to frighten them into believing that their computer is at serious risk. For instance, Avanquest warns that:

- "The PC errors, crashes and freezes you're experiencing are generally caused by faulty settings, broken registry settings and hard drive problems, which unfortunately, come with regular PC use"; and
- "Every day you work, play or browse on your computer, useless junk builds up clutter on your hard drive. Unfortunately, clutter causes damaging disk and system problems and ultimately can create dangerous privacy problems."

24.    Regardless of where the consumer encounters these statements, Avanquest

1    encourages the consumer to download or purchase the products to protect their computers.

2        **A.    Avanquest uniformly misrepresents the utility of its Scareware.**

3        25.    On its websites, as well as on the Scareware products' packaging (as indicated

4    above), Avanquest displays specific affirmations about the Scareware's functionality. Avanquest

5    generally asserts that its Scareware will improve the efficiency and performance of PCs, increase

6    system stability, repair errors, stop PC crashes and freezes, and serve as a comprehensive tool to fix

7    computer problems.

8        26.    More specifically, Avanquest represents through its website (www.avanquest.com)

9    that the System Suite and Fix-It Utilities products are designed to:

10           •       "Clean, fix and optimize the Windows Registry";

11           •       "Stop PC Crashes and Freezes";

12           •       "Repair System Errors";

13           •       "Optimize Internet speed and memory";

14           •       "[Provide] Total Virus and Spyware Protection"; and

15           •       "[Provide] Complete PC Maintenance."

16       27.    On its website, Avanquest further asserts that "with Fix-It Utilities and System

17   Suite's award-winning integrated technology[,] you'll get complete Virus Protection" that will

18   "[r]emove existing viruses, malware and spyware from your PC, plus prevent future infections

19   without sacrificing speed and performance." Avanquest also states that "Fix-it Utilities runs

20   hundreds of comprehensive diagnostic tests for you and will have your PC running like new all over

21   again."

22       28.    Likewise, on its System Suite PC Tune-Up & Repair 12 retail product packaging,

23   Avanquest asserts that the product will:

24           •       "Fix Windows Problems";

25           •       "Speed Up PC Start Time";

26           •       "[Provide] Malware, Virus, and Spyware Protection";

27

28

---

1          •      "[Provide] PC Diagnostics and Maintenance";

2          •      "Eliminate PC Crashes and Freezes"; and

3          •      "Clean and Repair Windows Registry."

4      29.    The same goes for Fix-It Utilities Professional 12's packaging, which claims that the

5   product:

6          •      "Keeps your PC running like new";

7          •      "Intelligently identifies system slowdowns";

8          •      "Fixes problems and speeds up Windows";

9          •      "[Provides] Real time virus and spyware protection"; and

10         •      "Stops PC Crashes and Freezes."

11     30.    But these representations do not accurately reflect the Scareware's true capabilities.

12  The truth is that, irrespective of its "anti-virus" feature,[4] System Suite and Fix-It Utilities primarily

13  perform only two main functions: they are registry cleaners and they remove superfluous

14  "temporary" files from a user's hard drive. These operations do not come close to squaring with

15  Avanquest's representations about the functionality of the Scareware. For instance, as discussed

16  more fully below, neither of these functions will remove damaging PC errors, appreciably improve

17  a computer's boot time, nor prevent the common causes of system freezes.

18     31.    Because of the impression created by Avanquest's affirmations of fact about the

19  Scareware's utility, consumers rightfully believe that Avanquest's software will detect the errors

20  and problems identified above. To validate this belief, Avanquest designed the Scareware to appear

21  as though it's performing actual analyses of consumers' PCs. This facade, however, is simply the

22  next phase of Avanquest's scheme.

23

24

25
_____
[4]      Avanquest claims that its Scareware also provides "total virus protection," but Plaintiff has
26  his doubts about the anti-virus feature as well. In certain instances Plaintiff's expert was able to
demonstrate that although the Scareware *detected* a harmful virus, it did not actually remove it.
27  Despite this, the Scareware reported the virus had been deleted.

28

SECOND AMENDED COMPLAINT                    9                    CASE NO. 3:12-cv-04391-WHO

**B.      Avanquest falsely informs consumers that their computers need repair, without conducting any credible evaluation of the computer's condition.**

32.      Upon purchasing, installing, and running the Scareware for the first time, a display screen is presented to the user indicating that the computer "is not optimized." *See* Figure 4 (showing screenshots of Fix-It Utilities' and System Suite's initial graphical user interfaces).



(Figure 4.)

33.      Clicking on the "Problems" section located on the Scareware's navigation bar triggers a display warning the user that "[x] amount of problems are affecting your PC's health and security" accompanied by an itemized list of problems that it claims are afflicting the computer, all of which (upon further inspection) refer only to the users' failure to have run the Scareware on their computer in the past, but not to any diagnoses of errors or problems actually existing on the computer. *See* Figure 5 (showing screenshots of Fix-It Utilities' and System Suite's error reporting interfaces *before* performing a diagnostic scan).



(Figure 5.)

34.     After warning the user that their computer is not optimized and is afflicted by serious problems, the Scareware advises the user to conduct a diagnostic scan by pressing "Analyze Now" or "One-Click Fix All."

35.     Upon completion of the diagnostic "scan," the Scareware renders an ominous graphical depiction of an alert sign showing that a number of serious "problems" exist on the computer and require fixing. *See* Figure 6 (showing screenshots of Fix-It Utilities' and System Suite's error reporting interfaces). In addition to this warning, the Scareware displays a visual representation of three cylinders, labeled "Optimization," "Security," and "Maintenance," with color spectrums ranging from red to green, along with corresponding percentages supposedly representing the results of an analysis of the computer's condition. *See id.*



(Figure 6.)

36.     While these visual and textual representations appear alarming to the user, the truth is that Avanquest designed the Scareware to report these conditions without *any* real evaluation of the computer's condition. In this way, the user believes that the Scareware is actually detecting and reporting harmful errors, presumably associated with the errors that Avanquest represented the software would remedy.

## IV.    Plaintiff's Expert Uncovers that Avanquest Designed its Scareware to Invariably Report Benign Errors as Harmful.

37.     On the surface, it appears as if the software is actually detecting, reporting, and repairing errors that threaten the operations of a user's PC. In reality, however, Avanquest intentionally designed its Scareware to vastly overstate both the amount and severity of errors that the software purportedly fixes in an effort to convince consumers that it functions as advertised—

1    i.e., that it actually detects and removes credible threats and PC problems.

2        38.    Through their attorneys, Plaintiff has engaged a computer forensics expert to

3    examine Avanquest's Scareware.[5] The results of this investigation confirm that the software always

4    reports that a user's PC is in poor condition—regardless of the condition or type of computer the

5    software is installed on. For instance, the Scareware's results shown in Figure 6 above were

6    produced after conducting a diagnostic scan on a *brand new computer*. Ostensibly these

7    representations scare the user into believing that the PC is damaged or at risk, and that continued

8    use of the Scareware is necessary to "fix" these problems. The facts show otherwise. Plaintiff's

9    expert has determined that, by any stretch of the imagination, many of the errors detected *are not*

10   *credible threats* to a PC's functionality.

11       39.    In relevant part, the expert's investigation uncovered that Avanquest programmed its

12   Scareware to (i) always identify problems on a user's computer (even when none exist), (ii)

13   artificially inflate the number of errors detected on a user's computer, (iii) characterize innocuous

14   items as harmful threats, and (iv) arbitrarily report that the user's "Optimization," "Security," and

15   "Maintenance" statuses are low without using any credible metrics to assess these issues.

16       40.    The expert's research also shows that the Scareware was deliberately designed to

17   mischaracterize the severity of errors to shock consumers into believing that their computers are

18   damaged. For instance, the expert confirmed that the software detected a number of innocuous and

19   benign files that *cannot* cause damage to a computer and reported that they were negatively

20   impacting the computer's performance.

21       41.    Through the deceptive scheme described herein, Avanquest has profited, and

22   continues to profit, by defrauding consumers into believing that their PCs are severely damaged

23   and/or at risk, and that the purchase and continued use of its Scareware is necessary to "fix" these

24   problems. But, because the software does not actually provide the benefits advertised, Avanquest

25

26   ――――――――――――――――
     [5]   All forensic testing described herein was performed on both the System Suite and Fix-It
27   Utilities software. Because the functionality of the two products and the results of such tests were
     nearly identical, they are discussed collectively unless otherwise indicated.

28

SECOND AMENDED COMPLAINT                    12                    CASE NO. 3:12-cv-04391-WHO

1   does not deliver on its promises to its users.

2   **V.     Avanquest is Not Alone in its Fraudulent Conduct.**

3          42.     Unfortunately for consumers, Avanquest is not alone in its use of the sorts of

4   fraudulent programmatic design and marketing practices at issue in this case. Rather, the utility

5   software industry has been fraught with these tactics for over a decade. It is only recently, however,

6   that software developers—like Avanquest and its competitors—have been called to account for

7   their profiting off of consumers who are unable to identify the fraudulent technological design and

8   methodologies underlying this type of supposedly performance-enhancing software.

9          43.     Indeed, numerous lawsuits have been filed against well-known competitors of

10  Avanquest (e.g., Symantec Corp. and AVG Technologies)—including several by Plaintiff's counsel

11  here—alleging similar claims related to the fraudulent design and marketing of so-called utility

12  software products. Several of those cases have resulted in classwide settlements and industry-

13  changing modifications to the software products at issue—making their detection, reporting and

14  repairing mechanisms far more transparent and more accurate when it comes to informing

15  consumers of the threats posed by existing errors on their computers—and still others are being

16  actively litigated. Rather than make the necessary changes to its software so that it *actually* detects,

17  reports and repairs harmful errors and problems on users' PCs, Avanquest continues to profit

18  through its fraudulent conduct.

19  **VI.    Plaintiff Boyd's Experience.**

20         44.     In or around January 2012, Plaintiff Johnny Boyd began to experience problems with

21  his computer. Specifically, his computer's overall and Internet speeds drastically decreased, he

22  began to receive numerous error messages on his computer screen, and the computer would often

23  freeze.

24         45.     Accordingly, Boyd visited a local office supply store to search for software that

25  would remedy his computer problems. At the store, Boyd encountered Avanquest's System Suite

26  PC Tune-Up & Repair 12 software, and viewed Avanquest's representations about the software's

27

28

utility located on its packaging materials, such as those described above, including its assertion that the product will "Identif[y] & fix[] Windows slowdowns" and "Stop[] PC Crashes and Freezes."

46.     Relying upon the packaging's representations, Boyd purchased Avanquest's System Suite PC Tune-Up & Repair 12 for $39.99. Boyd purchased System Suite 12 under the belief—created by Avanquest's misrepresentations—that the software would accurately scan his computer for issues and prevent his computer from continuing to malfunction as it had been.

47.     Upon running System Suite 12 for the first time, the software reported that the "Security," "Maintenance," and "Optimization" statuses of his computer were poor and displayed graphical representations reflecting the same. Because Avanquest designed its software to *always* report these statuses, Boyd was misled into believing that his computer was riddled with errors that were causing it to malfunction—as no actual assessment of the computer occurred.

48.     Contrary to Avanquest's representations, the System Suite 12 software purchased by Boyd did not perform any of the beneficial functions as described on its packaging. In fact, far from repairing his computer, immediately after running the software and attempting to fix the so-called errors that it detected, Boyd's computer froze—forcing him to perform a hard-reset. When Boyd attempted to restart the computer he was presented with a system notification informing him that his computer was afflicted with a variety of system errors—all of which prohibited him from turning on his computer. Since then, Boyd's computer has remained inoperative. Boyd reasonably relied upon Avanquest's representations about System Suite 12, in that he believed the software would actually perform the operations described above and restore his computer's functionality. But for these representations, Boyd would not have purchased the software.

## CLASS ALLEGATIONS

49.     **Class Definition**: Plaintiff Boyd brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

All individuals and entities in the United States that have purchased System Suite PC Tune-Up & Repair.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

50.    **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but on information and belief, Avanquest has sold its software to thousands of Class members throughout the country, making joinder of each individual member impracticable. Ultimately, the Class members will be easily identified through Avanquest's records.

51.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Avanquest's uniform wrongful conduct during transactions with Plaintiff and the Class.

52.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Avanquest has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

53.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members:

a)    whether Defendant intentionally designed the System Suite software to invariably report that harmful errors and threats exist on a user's computer, regardless of the computer's actual condition;

1            b)      whether Defendant intentionally misrepresented the functionality of the

2                     System Suite software;

3            c)      whether Defendant's conduct described herein constitutes violations of

4                     California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et*

5                     *seq.*;

6            d)      whether Defendant's conduct described herein constitutes fraudulent

7                     inducement;

8            e)      whether Defendant's conduct described herein constitutes a breach of

9                     contract; and

10           f)      whether Defendant's conduct described herein constitutes a breach of the

11                     implied covenant of good faith and fair dealing.

12      54.      **Superiority**: This class action is appropriate for certification because class

13 proceedings are superior to all other available methods for the fair and efficient adjudication of this

14 controversy and joinder of all members of the Class is impracticable. The damages suffered by the

15 individual members of the Class will likely be small relative to the burden and expense of

16 individual prosecution of the complex litigation necessitated by Avanquest's wrongful conduct.

17 Thus, it would be virtually impossible for the individual members of the Class to obtain effective

18 relief from Avanquest's misconduct. Even if members of the Class could sustain such individual

19 litigation, it would not be preferable to a class action because individual litigation would increase

20 the delay and expense to all parties due to the complex legal and factual controversies presented in

21 this Complaint. By contrast, a class action presents far fewer management difficulties and provides

22 the benefits of single adjudication, economies of scale, and comprehensive supervision by a single

23 court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be

24 ensured.

25      55.      **Policies Generally Applicable to the Class**: This class action is also appropriate for

26 certification because Avanquest has acted or refused to act on grounds generally applicable to the

27

28

SECOND AMENDED COMPLAINT          16          CASE NO. 3:12-cv-04391-WHO

1    Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

2    conduct toward the members of the Class, and making final injunctive relief appropriate with

3    respect to the Class as a whole. Avanquest's policies challenged herein apply and affect members of

4    the Class uniformly, and Plaintiff's challenge of these policies hinges on Avanquest's conduct with

5    respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Avanquest has acted

6    and failed to act on grounds generally applicable to Plaintiff and the other members of the Class,

7    requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward

8    members of the Class.

9         56.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

10   Definition" based on facts learned in discovery.

11                              **FIRST CAUSE OF ACTION**
                        **Violations of California's Unfair Competition Law**
12                      **Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
                            **(On Behalf of Plaintiff and the Class)**
13
          57.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth
14
     herein.
15
          58.    California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et*
16
     *seq.*, protects both consumers and competitors by promoting fair competition in commercial
17
     markets for goods and services.
18
          59.    The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. A
19
     business practice need only meet one of the three criteria to be considered unfair competition.
20
          60.    The utility of a consumer product is a material term of any transaction because it
21
     directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any
22
     deception or fraud related to the utility of a product is materially misleading.
23
          61.    Likewise, the price of a consumer product is a material term of any transaction
24
     because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a
25
     product. Any deception or fraud related to the price of a product is materially misleading.
26
          62.    As described herein, Avanquest engaged in fraudulent and unfair business practices
27

28

---

SECOND AMENDED COMPLAINT                    17                    CASE NO. 3:12-cv-04391-WHO

as defined by the UCL by, *inter alia*: (i) misrepresenting System Suite's utility, including through assertions such as those depicted in Figure 1 and as described above; (ii) misrepresenting the results of the diagnostic scans (i.e., the overall condition of users' computers) through in-software representations; (iii) using the misrepresentations to induce consumers into continuing to use System Suite; and (iv) selling software that lacks the advertised utility, similarly produced false error reports, and was otherwise incapable of functioning as Avanquest represented it would.

63.     Specifically, Avanquest affirmatively represented to Plaintiff that System Suite would honestly and accurately scan his PC for harmful problems, increase his PC's speed and stability, increase the speed of his Internet connection, and protect his PC from harmful programs. Further, through the System Suite software itself, Avanquest affirmatively represented that Plaintiff's PC system status was low and that harmful errors existed on his PC.

64.     The above affirmative representations, as well as the results of the "diagnostic scan" provided by the software were, in fact, false. System Suite did not perform an actual evaluation of Plaintiff's computer or any problems existing on it and did not function as Avanquest described.

65.     Avanquest violated the UCL's "fraudulent" prong by intentionally designing System Suite to report fake errors and misrepresent the system status of consumers' computers, with the intent to defraud consumers into purchasing and continuing to use the System Suite software. A reasonable consumer was likely to rely, as Plaintiff and the Class did, on Avanquest's misrepresentations regarding the benefits offered by System Suite. Moreover, Avanquest's misrepresentations were likely to deceive reasonable consumers, and, in fact, did deceive Plaintiff and the Class into purchasing and continuing to use the System Suite software that lacked the advertised utility.

66.     Avanquest has also violated the UCL's "unfair" prong by causing substantial injury to consumers through the conduct alleged above. The injuries caused by Avanquest's unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and could not reasonably have been known by consumers. Given the information asymmetry between

1 Avanquest and consumers regarding System Suite's functionality, Plaintiff and the Class could not

2 reasonably have known of the falsity of Avanquest's representations or avoided the harm they

3 caused.

4        67.    Avanquest's fraudulent and unfair conduct occurred during the marketing and sale of

5 computer software products, and therefore occurred in the course of Avanquest's business practices.

6        68.    This conduct occurred out of and emanated from Defendant's Avanquest's offices

7 and headquarters located in California.

8        69.    Avanquest's fraudulent and unfair conduct directly and proximately caused Plaintiff

9 and the Class actual monetary damages in the form of the price paid (or a portion thereof) for the

10 System Suite software.

11        70.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring

12 Avanquest to cease the unfair and fraudulent practices described herein; (2) awarding Plaintiff and

13 the Class all appropriate damages; and (3) awarding reasonable costs and attorneys' fees pursuant to

14 Cal. Code Civ. Proc. § 1021.5.

15 **SECOND CAUSE OF ACTION**
**Fraudulent Inducement**
16 **(On Behalf of Plaintiff and the Class)**

17        71.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

18 herein.

19        72.    As depicted with particularity in the Figures above, and as described throughout all

20 Counts of this Complaint, Avanquest has used, and continues to use, marketing tactics it knows or

21 reasonably should know are false and misleading.

22        73.    To induce Plaintiff into purchasing and continuing to use the System Suite software,

23 Avanquest affirmatively represented to Plaintiff that the System Suite software provided a certain

24 level of utility. Specifically, Avanquest represented that the System Suite software would honestly

25 and accurately scan his PC for harmful problems, increase his PC's speed and stability, increase the

26 speed of his Internet connection, protect his computers from harmful programs, and perform

27

28

1    beneficial tasks such as those depicted in Figure 1 and as described above. Further, through the

2    System Suite software itself, Avanquest affirmatively represented that the system status of

3    Plaintiff's PC was low and that numerous errors existed on his PC.

4         74.    Avanquest's affirmative representations were in fact false. In particular Avanquest's

5    System Suite software does not increase a computer's performance and stability in the manner

6    Avanquest described, nor does it protect the user's security as represented. Likewise, Avanquest's

7    representations through the software itself were false; as the System Suite software was not

8    conducting credible diagnostics of a computer's condition, it could not actually render meaningful

9    reports regarding the PC's status.

10        75.    The utility of a consumer product is a material term of any transaction because it

11   directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue

12   to use a product. Any deception or fraud related to the utility of a product is materially misleading.

13        76.    As System Suite's developer, Avanquest knew that its representations about the

14   System Suite software's utility were false. Avanquest intentionally designed its public

15   representations to mislead consumers about the System Suite software's utility, and programmed

16   the System Suite software to falsely report PC errors and deceive users about their computers'

17   system health.

18        77.    Avanquest made its misrepresentations specifically so as to induce Plaintiff and the

19   Class to rely upon them by purchasing and continuing to use the software. Plaintiff and the Class

20   did in fact rely upon these misrepresentations and purchased and continued to use System Suite to

21   their detriment.

22        78.    As a consumer lacking the requisite technical expertise to independently gauge

23   System Suite's underlying functionality, and taking Avanquest's statements at face value, Plaintiff

24   justifiably relied upon Avanquest's misrepresentations and would not have purchased System Suite

25   but for the misrepresentations that the software would perform the beneficial tasks advertised.

26        79.    By using false and fraudulent marketing tactics to misrepresent System Suite's actual

27

28

SECOND AMENDED COMPLAINT                          20                         CASE NO. 3:12-cv-04391-WHO

1    utility and inducing Plaintiff and the Class to purchase and continue to use the software based on

2    those misrepresentations, Avanquest has engaged in fraudulent practices designed to mislead and

3    deceive consumers.

4         80.      As a result of relying on Avanquest's misrepresentations, Plaintiff has been damaged

5    in the amount of the System Suite software's purchase price, or at least a portion thereof.

6         81.      Plaintiff therefore prays for relief in the amount of the purchase price (or a portion

7    thereof) of Avanquest's System Suite software. Plaintiff further alleges that Avanquest's conduct

8    and misrepresentations were made with malice and in conscious disregard of Plaintiff's rights,

9    thereby entitling him to punitive damages against Avanquest in an amount sufficient to deter such

10    conduct in the future.

11 

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

13         82.      Plaintiff incorporates by reference the foregoing allegations as if fully set forth

14    herein.

15         83.      Plaintiff and the Class members entered into agreements with Avanquest whereby

16    Avanquest agreed to sell, and Plaintiff and the Class agreed to purchase, software that would detect

17    and remove legitimate computer errors from Plaintiff's and the Class's computers, and perform the

18    beneficial tasks depicted in Figure 1 and described above.

19         84.      Based on the foregoing representations, Plaintiff and the Class paid, and Avanquest

20    accepted, the System Suite software's purchase price, and therefore performed their obligations

21    under the contracts.

22         85.      As such, Avanquest voluntarily assumed a contractual obligation to honestly

23    diagnose problems on Plaintiff's and the Class's PCs and to honestly indicate whether problems

24    exist. This obligation is a material term of the agreement. Avanquest did not honor this obligation.

25         86.      Avanquest also assumed an obligation to provide Plaintiff and the Class a product

26    that would remove errors from their PCs. Avanquest did not honor this obligation.

27 

28

1    87.    Avanquest breached its contracts with Plaintiff and the Class by failing to honestly

2    and accurately inform them about the true condition of their computers, and further by providing

3    software that failed to offer the benefits promised.

4    88.    The aforementioned breaches of contract have directly and proximately caused

5    Plaintiff and the Class economic injury and other damages, because they purchased a product that

6    does not perform as Avanquest represented, and therefore lacks the promised and paid-for utility.

7
### FOURTH CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing
(On Behalf of Plaintiff and the Class)**

8

9    89.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

10   herein.

11   90.    In order to benefit from Avanquest's supposed error and threat-removal software

12   products, Plaintiff and the Class affirmatively allowed Avanquest to install the System Suite

13   software on their computers.

14   91.    Avanquest's agreement to install software to diagnose and remove threats from

15   Plaintiff's and the Class's PCs in the manner depicted in Figure 1 and as described above in

16   exchange for fees is a valid and enforceable contract between Plaintiff and the Class on the one

17   hand, and Avanquest on the other.

18   92.    Avanquest breached the provisions of the agreement, specifically by not honoring its

19   responsibilities to perform truthful diagnostic and remedial operations.

20   93.    California law recognizes the implied covenant of good faith and fair dealing in

21   every contract.

22   94.    Implicit in the contract were provisions prohibiting Avanquest from engaging in

23   conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the

24   contract.

25   95.    Plaintiff and the Class sought to receive the bargained-for benefit of obtaining a

26   software product that performed truthful diagnostic and remedial operations, as advertised by

27

28

1 | Avanquest.

2 | 96.     Rather than provide the bargained-for benefit to Plaintiff and the Class, Avanquest

3 | produced software that falsely represented the condition of scanned computers and failed to perform

4 | its advertised functions. Avanquest's conduct frustrated Plaintiff's and the Class's rights to receive

5 | the benefits of the contract by creating the illusion that the benefits were supplied (when in fact,

6 | they were not), and leading Plaintiff and the Class to believe that their contracts had been fulfilled.

7 | 97.     Avanquest's misconduct and breach of the implied covenant of good faith and fair

8 | dealing as described herein resulted in injury to Plaintiff and the Class in the form of price paid in

9 | excess of the System Suite software's actual utility and/or money conferred on Avanquest by

10 | Plaintiff and the Class, in exchange for fully functional software, that was knowingly and

11 | wrongfully retained by Avanquest.

12 | **PRAYER FOR RELIEF**

13 | WHEREFORE, Plaintiff Johnny Boyd, on behalf of himself and the Class, respectfully

14 | requests that this Court enter an Order:

15 | A.     Certifying this case as a class action on behalf of the Class defined above, appointing

16 | Plaintiff as class representative, and appointing his counsel as class counsel;

17 | B.     Declaring that Avanquest's actions, as set out above, violate California's Unfair

18 | Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), and constitute fraudulent inducement,

19 | breach of contract, and breach of the implied covenant of good faith and fair dealing;

20 | C.     Awarding damages, including statutory and punitive damages where applicable, to

21 | Plaintiff and the Class in an amount to be determined at trial;

22 | D.     Awarding injunctive and other equitable relief as is necessary to protect the interests

23 | of the Class, including, *inter alia,* an order: (i) prohibiting Avanquest from engaging in the

24 | wrongful and unlawful acts described herein, (ii) requiring Avanquest to disclose and admit the

25 | wrongful and unlawful acts described herein, and (iii) requiring Avanquest to fully disclose the true

26 | nature of its software products in the future;

27 |

28 |

1       E.     Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys'

2  fees;

3       F.     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

4  allowable;

5       G.     Providing such other injunctive and/or declaratory relief as is necessary to protect

6  the interests of Plaintiff and the Class; and

7       H.     Awarding such other and further relief as the Court deems reasonable and just.

8                  **DEMAND FOR JURY TRIAL**

9      Plaintiff demands a trial by jury for all issues so triable.

10                  Respectfully submitted,

11                  **JOHNNY BOYD**, individually and on behalf of all
others similarly situated,

12  Dated: October 21, 2014

13                  By:  /s/ Benjamin H. Richman
                     One of Plaintiff's Attorneys

14                  Jay Edelson (Admitted *Pro Hac Vice*)

15  jedelson@edelson.com
                Rafey S. Balabanian (Admitted *Pro Hac Vice*)

16  rbalabanian@edelson.com
                Benjamin H. Richman (Admitted *Pro Hac Vice*)

17  brichman@edelson.com
                Chandler R. Givens (Admitted *Pro Hac Vice*)

18  cgivens@edelson.com
                EDELSON PC

19  350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654

20  Tel: 312.589.6370
Fax: 312.589.6378

21                  Mark Eisen (SBN – 289009)

22  meisen@edelson.com
                EDELSON PC

23  555 West Fifth Street, 31st Floor
Los Angeles, California 90013

24  Tel: 213.533.4100
Fax: 213.947.4251

25

26

27

28

SECOND AMENDED COMPLAINT        24       CASE NO. 3:12-cv-04391-WHO

EXHIBIT 5

# California Secretary of State Debra Bowen

**Business Entities (BE)**

Online Services
- **E-File Statements of Information for Corporations**
- **Business Search**
- **Processing Times**
- **Disclosure Search**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Statements of Information**
(annual/biennial reports)

**Filing Tips**

**Information Requests**
(certificates, copies &
status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**

Customer Alerts
- **Business Identity Theft**
- **Misleading Business Solicitations**

## Business Entity Detail

Data is updated to the California Business Search on Wednesday and Saturday mornings. Results reflect work November 07, 2014. Please refer to **Processing Times** for the received dates of filings currently being proce a complete or certified record of an entity.

| | |
|---|---|
| Entity Name: | AVANQUEST NORTH AMERICA INC. |
| Entity Number: | C1376174 |
| Date Filed: | 06/02/1986 |
| Status: | ACTIVE |
| Jurisdiction: | CALIFORNIA |
| Entity Address: | 23801 CALABASAS RD STE 2005 |
| Entity City, State, Zip: | CALABASAS CA 91302-1547 |
| Agent for Service of Process: | BRUCE FRIEDMAN |
| Agent Address: | 4040 LYCEUM AVE |
| Agent City, State, Zip: | LOS ANGELES CA 90066 |

* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Corporations Code **section 2114** for information relating to service upon corporations that have surrend
- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definiti**

**Modify Search    New Search    Printer Friendly    Back to Search Results**

**Privacy Statement | Free Document Readers**
Copyright © 2014   California Secretary of State